1

*Lead Counsel*
Matthew Kurilich, Bar Number 30172
2 17321 Irvine Boulevard, Suite 115
Tustin CA 92780
3 Tel (714) 734-3715
Fax (714) 734-3716
4 mattkurilich@yahoo.com

5 *Co-Counsel*
Mark Morrison, Bar Number 152561
6 220 Second ST, No. 30
Langley, WA 98260
7 Tel 360-221-0253
Fax 360-851-2010
8 mark@markmorrisonlaw.com

9

10 **UNITED STATES DISTRICT COURT**

11 **NORTHERN DISTRICT OF CALIFORNIA**

12

13 MARK MORRISON, an individual;    )    **Case No:  3:08-CV-1945-EMC**
                                   )
                Plaintiff,         )    **PLAINTIFF'S MOTION FOR**
14                                 )    **RELIEF FROM STIPULATION**
                                   )    **AND OPPOSITION TO**
       vs.                         )    **DEFENDANT'S MOTION FOR**
15                                 )    **BINDING ARBITRATION;**
                                   )    **MEMORANDUM OF POINTS**
16 ULI ZANGPO, an individual;      )    **AND AUTHORITIES;**
                                   )    **DECLARATION OF MARK**
                Defendants.        )    **MORRISON; DECLARATION**
17                                 )    **OF JIM SCIARONI**
                                   )
18                                 )
                                   )    Date:
19                                 )    Time:
                                   )    Courtroom:  C, 15th FLR
20                                 )
                                   )
21 _____  )

22

23     Plaintiff, MARK MORRISON, hereby moves for relief from his earlier

24 stipulation to arbitration, and objects to Defendant's motion for binding arbitration

25 as follows:

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### *Statement of Issues*

Does the contract governing the parties' dispute over the Prospect property contain an arbitration clause?

If not, is the Prospect contract subject to the arbitration clause in another contract governing the development of another property (the Manzanita property)?

If not, and Defendant files a cross-complaint based upon the Manzanita contract, should the cases be bifurcated or severed?

May Plaintiff withdraw his non-opposition to defendant's motion for binding arbitration given Defendant's concession that things have changed materially since Plaintiff filed his non-opposition?

### *Statement of Facts*

Plaintiff owned a property at 30 Prospect Avenue, San Anselmo, California (the Prospect Property). *See* Declaration of Mark Morrison. Plaintiff acquired the Prospect Property in December 2004 as part of a 1031 exchange and, upon ownership, began renting the Prospect Property. *Id.* The intention of Plaintiff was to rent the Prospect Property for at least two years, and possibly make it his primary family residence at a later date. *Id.*

Plaintiff's daughter became friends with a girl whose father, Jim Sciaroni, became friends with Plaintiff. *See* Declarations of Mark Morrison and Jim Sciaroni. Plaintiff and Sciaroni agreed that if they could find suitable properties, they would build homes adjacent to one another to create an informal family community. *Id.*

2

In the Fall of 2005, Sciaroni approached Plaintiff about a property located in San Geronimo owned by Defendant (Manzanita Property).[1]  *Id.*  The Manzanita Property was approximately 20+ acres, and was owned by Defendant and was in partnership with Steven Finkbine (Finkbine) with respect to the ultimate ownership of the Property.  *See* Declaration of Mark Morrison.   Defendant had acquired the Manzanita Property approximately two years before, and Defendant was in the process of splitting the land into four parcels.[2]  *Id.*

Plaintiff, Defendant, Sciaroni and Finkbine entered into a partnership with respect to the Manzanita Property on December 13, 2005 after all parties had met and gotten to know each other--with the intention of creating an informal cooperative community setting.  *See* Declarations Mark Morrison and Jim Sciaroni.  Defendant took the lead in developing the Manzanita Property and made representations to all parties that they would have buildable lots as soon as the summer of 2006.  *Id.*

Prior to meeting Plaintiff, Defendant had, and continued to maintain, a long-standing relationship with a well-known attorney and prior county supervisor, Gary Giacomini.  Giacomini has given Defendant legal counsel with respect to splitting the Manzanita property into four parcels. *Id.*  The Manzanita parties requested that Plaintiff draw up the legal agreement between all of them, and Plaintiff agreed to do so.  Plaintiff complied with the California Rule of Professional Conduct 3-300 (*Avoiding Interests Adverse to a Client*), by having Defendant and his wife sign a disclosure.  *Id.*  Plaintiff has never before or since provided any legal services to

---

[1]     The Manzanita Property is raw land owned by Defendant and is completely separate from the Prospect Property, which was owned by Plaintiff.

PLAINTIFF'S MOTION FOR RELIEF FROM STIPULATION AND OPPOSITION TO DEFENDANT'S

MOTION FOR BINDING ARBITRATION

Defendant or his wife.  *See* Declaration of Mark Morrison.  Moreover, Plaintiff has neither billed nor been paid for drafting the legal agreement regarding the Manzanita Property.[3]  *See* Declarations of Mark Morrison and Jim Sciaroni

Defendant told Plaintiff and Sciaroni he was concerned that--due to political and environmentalist concerns—recording any ownership transfer documents to the Manzanita property into each of the parties' names would hinder Defendant's ability to split the lot.  *See* Declarations of Mark Morrison and Jim Sciaroni.  In addition, Plaintiff and Sciaroni wanted the option to have their money returned if Defendant failed to deliver buildable lots.  As a result, Plaintiff and Sciaroni made a secured loan to Defendant, along with an option to purchase two lots.  Plaintiff and Sciaroni agreed to loan Defendant a total of $725,000 as follows:   $475,000 upon execution of the note and $250,000 deferred loan payments.  *See* Declarations of Mark Morrison and Jim Sciaroni.  Sciaroni loaned his half of the $250,000 or $125,000.  *Id.*  Plaintiff and Defendant made an oral agreement that Plaintiff would make his $125,000 loan upon the sale of the Prospect Property or earlier receipt of funds from other sources.  *See* Declaration of Mark Morrison.  In the interim (and reflecting the oral agreement), Plaintiff paid Defendant monthly interest on the outstanding loan amount (i.e., originally $125,000).[4]  *Id.*   Upon entering into the first Prospect Agreement, Plaintiff and Defendant agreed that monthly interest payments on the loan were no longer necessary since Defendant would be

---

[2]    Finkbine owned an adjacent parcel that was to be enlarged becoming one of the four parcels.

[3]    Plaintiff is a civil trial attorney focusing on consumer protection in the areas of class action, mass tort and personal injury.

[4]    Plaintiff made payments to reduce the remaining amount due on the Note down, from $125,000 to $83,000, in response to requests for such payment from Defendant.  *See* Declaration of Mark Morrison.

receiving cash flow from the Prospect Agreement.  *Id.* Defendant has failed to provide Plaintiff, Sciaroni or Finkbine with buildable lots. *See* Declarations of Mark Morrison and Jim Sciaroni.

Once Plaintiff began constructing the Prospect Property, Defendant asked Plaintiff if Defendant could work on the project because Defendant needed money.  *See* Declaration of Mark Morrison.  Plaintiff had hired a licensed contractor, Paul Warren, to act as the general contractor on the job.  *Id.* Defendant and Paul Warren eventually had personal conflicts, to the point of threatening to physically abuse one another.  *Id.* Defendant persuaded Plaintiff that Paul Warren was not fit for the job, so Plaintiff ended the working relationship between him and Paul Warren.  *Id.* Defendant    then    made    a proposal to Plaintiff that Defendant act as the general contractor, which Plaintiff initially declined.  *Id.*

Plaintiff subsequently brought several longtime friends from Southern California and Oregon to help him build the house.  *Id.* Defendant continued to ask Plaintiff if Defendant could act as the general contractor for the Prospect Property.  *Id.* After several emails and conversations with Defendant, Plaintiff and Defendant entered into a written agreement on June 21, 2006, and they entered the Final Agreement (i.e., the contract at issue in this case) on December 5, 2007.  *Id.*

***Does the Prospect Final Agreement contain an enforceable binding arbitration clause?***

"(A)rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *United Steelworkers of America v. Warrior & Gulf Navigation Co.* 363 US 574,

582(1960);  *Spear, Leeds & Kellog v. Central Life Assur. Co.*, 85 F.3d 21, 28 (2nd Cir. 1996).  The Prospect Final Agreement does not contain an arbitration clause. Therefore, on its face as a stand-alone agreement, it does not require the parties to arbitrate their dispute regarding the Prospect property.

### Is the Prospect Final Agreement subject to the arbitration clause in the Manzanita Agreement?

Defendant alleges:  "This action arises from a partnership between Plaintiff, Mark Morrison, Esq., Defendant Uli Zangpo, and other individuals not sued herein to finance and develop real estate properties in Northern California."  Defendant's Statement of the Facts Joint Case Management Statement.  Defendant further states, "Plaintiff acted as the attorney for the Manzanita (and Prospect) projects."

In Defendant's three-page Notice of Motion and Motion to Stay Proceedings and Discovery Pending Mandatory Binding Arbitration, the only argument made to support this claim is as follows: "This "contract" [i.e., the 6-21-06 (the Contract) and 12-05-07 (the Final Agreement) Prospect agreements] is actually an addendum to an earlier contract between the parties, which was titled "Agreement of Understanding—Manzanita" and was made effective as of December 13, 2005."

In other words, the Defendant's sole basis for asserting that the Final Agreement regarding the Prospect property is subject to an arbitration clause is Defendant's bare assertion that the Final Agreement regarding the Prospect property was actually an *addendum* to the Manzanita Agreement.  That assertion is

6

flatly false.

Plaintiff wholly owned the Prospect Property.  Neither Defendant, Finkbine nor Sciaroni were ever involved with the Prospect Property.  *See* Declarations of Mark Morrison and Jim Sciaroni.  Plaintiff, Defendant, Finkbine and Sciaroni entered into a discrete agreement--not for the broad purpose of developing "properties in Northern California"--but simply to create family homes for each of the parties as part of the Manzanita Agreement. *Id.*

The Prospect Final Agreement and Manzanita Agreements are stand-alone contracts dealing with different and unique properties, parties, and purposes.  They have only one connection: Defendant put up the $83,000 remaining under the Manzanita Promissory Note as security for Defendant's performance under the Prospect Final Agreement.  That connection does not convert the Prospect Final Agreement into an "addendum" to the Manzanita Agreement.  Defendant thus may not unilaterally inject the Manzanita Agreement's arbitration clause into the Prospect Final Agreement.

### *Should the cases be bifurcated or severed if Defendant files a cross-complaint based upon the Manzanita Agreement?*

"The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third party claim, or of any

separate issues or of any number of claims…" FRCP 42(b).  Factors considered by the court are prejudice, reducing risk of confusion and separable issues.  *Hirst v. Gertzen* (9th Cir. 1982) 676 F2d 1252, 1261; *Angelo v. Armstrong World Industries, Inc.* (10th Cir. 1993) 11 F3d 957, 964; *Matter of Rhone-Poulenc Rorer Inc.* (7th Cir. 1995) 51 F3d 1293, 1303 --- Whether the issues are clearly separable. The instant claim based on the Prospect Agreement is a very straightforward breach of contract claim including Plaintiff, Defendant and the building of a single-family residence with clearly separable issues.  Allowing any Manzanita Property claims including Plaintiff, Defendant, Jennifer Baker, Steven Finkbine, Jim Sciaroni, Sandra Simich, and the creation of four lots from the Manzanita Property would create prejudice and confusion.

"Any claim against a party may be severed and proceeded with separately." FRCP 21.  Although FRCP 21 is entitled "Misjoinder and Nonjoinder of Parties," the ability to sever claims under Rule 21is not limited to curing misjoinder of parties.  *United States v. O'Neil*, 709 F2d 361, 369 (5th Cir. 1983);  *Henderson v. AT&T Corp.,* 918 F.Supp. 1059, 1065 (SD TX 1996) (severance ordered of employment discrimination claims by plaintiffs).  Provided no substantial right will be prejudiced thereby, particular parties or claims may be severed from the action on the ground that their joinder is not proper under Rule 20 i.e., that the right to relief asserted "does not arise out of or relate to the same transaction or

PLAINTIFF'S MOTION FOR RELIEF FROM STIPULATION AND OPPOSITION TO DEFENDANT'S

MOTION FOR BINDING ARBITRATION

occurrence" or there is no "question of law or fact common to all parties." See *Coughlin v. Rogers,* 130 F3d 1348, 1351 (9th Cir. 1997). Even where joinder is proper, a severance may be ordered to prevent delay or prejudice (see FRCP 20(b)). *Coleman v. Quaker Oats Co.,* 232 F3d 1271, 1296 (9th Cir. 2000) (10 plaintiffs' age discrimination claims severed because of potential prejudice to employer and risk of jury confusion from having 10 different plaintiffs testify at trial).

In this case, we have two separate contracts with distinct issues and parties. To combine them would create prejudice and confusion. Because the pending dispute over the Prospect Property Agreement is not governed by the arbitration clause in the Manzanita Agreement, any purported claim or claims by Defendant based on the Manzanita Agreement should be bifurcated or severed from this case.

### *May plaintiff withdraw his non-opposition to defendant's motion for* binding arbitration**?**

The American Law Reports article quoted below describes the requirements for relief from a stipulation:

> It is a general rule that a trial court may, in the exercise of judicial discretion, upon proper cause shown, relieve a party from a stipulation entered into in the course of a judicial proceeding when on the one hand it appears that such relief is necessary to prevent manifest injustice to the party seeking it, and on the other hand that the granting of relief will not place the adverse party at any disadvantage by reason of having acted in reliance upon the stipulation entered into."
> Thus, when a party who has entered into a stipulation can

show that he was induced to do so by reason of fraudulent representations or false statements made by the other party, that duress and undue influence were practiced upon him, that he acted under mistake, or even that his entry into the stipulation was the result of his own improvidence, inadvertence, or excusable neglect, and he makes a timely application to be relieved from the stipulation, the court will grant such relief as may be necessary to prevent injustice to the applicant, if the relief granted will not be accompanied by greater inequity to the adversary. It is equally clear that in the absence of any of the grounds specified, or of facts or circumstances showing a likelihood that injustice or inequity will result to one of the parties through either the loss of a substantive right or being placed at a procedural disadvantage upon the trial which could just as well be eliminated without hardship to anyone, a stipulation entered into during the course of litigation, particularly if acted upon in such a way that its original object would be frustrated should it be interfered with, will be considered as an unimpeachable contract. These rules, which are complementary in nature, are believed to constitute the basis of the reasoning of all the cases upon this subject, and to express the broad considerations, which govern appellate courts in reviewing discretionary rulings.  As a general rule, relief may be given against a stipulation made in the course of judicial proceedings if there has been a change in conditions or unforeseen developments which would render its enforcement inequitable, provided there was diligence in discovering the facts relative to the disputed matter, the application is timely, and the opposing party has not so changed his position as to be prejudiced to a greater extent than the applicant.

A stipulation ambiguous in its terms, concerning which the parties disagree after filing, is correctly withdrawn by leave of court upon a motion showing that it was made through mistake of the facts by the party asking leave to withdraw." *Botts v. Martin* (1875) 44 Tex 91.

Relief from Stipulations, H.D. Warren., 161 A.L.R. 1161 (orig. pub. 1946; 2008 Thomson Reuters/West).

When plaintiff entered into the stipulation for binding arbitration, it was

10

due to mistake, excusable neglect or improvidence. Plaintiff stated:

> [P]aragraph 27 of the "Manzanita Agreement" stipulates that such arbitration will cover any and all actual and potential claims and disputes relating, to or arising from, the Manzanita property that is the subject of the Manzanita Agreement, and stipulates that arbitration thus extends to any and all actual and potential claims and disputes relating, to or arising from, the Prospect property referred to in the Complaint because the parties' contract regarding the Prospect property refers to the Manzanita property

Defendant concedes that the facts have changed since Plaintiff filed his non-opposition to arbitration (and the original proposed order was filed):

> Again, Defendant chose September 10 as a hearing date on his motion to stay proceedings pending arbitration to give the parties a chance to informally resolve their disputes prior to the hearing on that motion through mediation. Since Plaintiff did not oppose that motion, the Court granted it early, but the form of order still needs to be addressed. If this motion to dismiss is not granted, *Defendant would like to submit a new proposed order on the referral to arbitration,* **as various items have changed since the original proposed order was submitted.**

Defendant's Reply to Opposition to Motion to Dismiss for Lack of Jurisdiction and Reply to Non-Opposition of Arbitration Referral (emphasis added). Neither Plaintiff nor Defendant has ever had a clear understanding with respect to the terms of the binding arbitration stipulation, and there has never been a meeting of the minds with respect thereto.

Moreover, Plaintiff's non-opposition was a mistaken legal tactic to include and finalize any and all legal relationships with Defendant. Plaintiff wanted to

assure the Court of his intention to arbitrate all Prospect Agreement issues. It was a mistake, excusable neglect and improvident for Plaintiff to make this statement as his basis for stipulating to binding arbitration. His belief at the time was that the case could be efficiently, effectively and fairly adjudicated by stipulating to binding arbitration.

Due to Plaintiff's misunderstanding, he believed that the Court would order binding arbitration per its own rules. Plaintiff would not have filed the non-opposition had he known he would be exposed to Defendant's attorney's fees, limited to JAMS in choosing an arbitrator or unable to conduct discovery in this case.

Since entering the stipulation for binding arbitration, Defendant has continued to act in bad faith by failing to comply in good faith to F.R.C.P. 26 by not delivering, as of the filing of this motion, any supporting documents to his legal position whereas Plaintiff has delivered to Defendant 837.6MB of data.

Moreover and more importantly, Defendant has stated his intention to file a significant cross-complaint against Plaintiff relative to the Manzanita Agreement. This change of condition is significant to Plaintiff's case because it is not relevant to the Prospect Agreement, and, more likely than not, is being brought as a red herring to create confusion and prejudice in the clarity of the instant case.

The cases which deal with questions as to relief from stipulations relating principally to procedural matters reflect in

PLAINTIFF'S MOTION FOR RELIEF FROM STIPULATION AND OPPOSITION TO DEFENDANT'S

MOTION FOR BINDING ARBITRATION

general the distinctions noted in VI a, supra, in that more liberality in the granting of relief as to those matters is evident where no prejudice will result and the best interests and convenience of the parties and expedition of the proceedings will be promoted.

*Relief from Stipulations,* H.D. Warren. 161 A.L.R. 1161.

This case is in its infancy as Defendant has yet to file an answer to the complaint. Granting Plaintiff relief from the stipulation thus will not place Defendant at any disadvantage by reason of having acted in reliance upon the stipulation entered into because there has been no such reliance.

Denying relief would place Plaintiff in the position of losing his Constitutional Seventh Amendment right to a trial based upon a very straightforward breach of contract case relative to only the Prospect Final Agreement, and leave him bound to a binding arbitration that is arguably not relevant to this case and muddled together with the Manzanita Agreement. Plaintiff is in desperate need of this Court's fair, intelligent and firm hand to keep the defendant in line with the ethical and legal rules of the law during the resolution of this complaint. This Court has the judicial power and discretion to grant plaintiff's request for relief.

## <u>CONCLUSION</u>

Plaintiff respectfully requests that the Court grant him relief from his stipulation, and sustain the above objections.

PLAINTIFF'S MOTION FOR RELIEF FROM STIPULATION AND OPPOSITION TO DEFENDANT'S

MOTION FOR BINDING ARBITRATION

Dated:  8-1-08

Respectfully submitted,

MATT KURILICH ATTORNEY AT LAW


By: /s/Matt Kurilich
    Matt Kurilich,
    Attorney for Plaintiff

*Co-Counsel*
Mark Morrison, Bar Number 152561
220 Second ST, No. 30
Langley, WA 98260
Tel 360-221-0253
Fax 360-851-2010
mark@markmorrisonlaw.com

14

PLAINTIFF'S MOTION FOR RELIEF FROM STIPULATION AND OPPOSITION TO DEFENDANT'S

MOTION FOR BINDING ARBITRATION

*Lead Counsel*
Matthew Kurilich, Bar Number 30172
17321 Irvine Boulevard, Suite 115
Tustin CA 92780
Tel (714) 734-3715
Fax (714) 734-3716
mattkurilich@yahoo.com

*Co-Counsel*
Mark Morrison, Bar Number 152561
220 Second ST, No. 30
Langley, WA 98260
Tel 360-221-0253
Fax 360-851-2010
mark@markmorrisonlaw.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK MORRISON, an individual; | ) Case No:  3:08-CV-1945-EMC |
| | ) |
| Plaintiff, | ) **DECLARATION OF MARK** |
| | ) **MORRISON IN SUPPORT OF** |
| vs. | ) **PLAINTIFF'S MOTION FOR RELIEF** |
| | ) **FROM STIPULATION AND** |
| ULI ZANGPO, an individual; | ) **OPPOSITION TO DEFENDANT'S** |
| | ) **MOTION FOR BINDING** |
| Defendants. | ) **ARBITRATION** |
| | ) |
| | ) Date: |
| | ) Time: |
| | ) Courtroom:  C, 15th FLR |

## DECLARATION OF MARK MORRISON

I, MARK MORRISON, hereby declare under penalty of perjury as follows:

1. I, MARK MORRISON, am an attorney at law duly licensed to practice before all courts of

the State of California.  I am a sole practitioner.

1

2.  I have personal knowledge of the facts set forth herein, and if called upon to do so, I could competently testify to the same.

3.  I owned a property at 30 Prospect Avenue, San Anselmo, California (the Prospect Property).  I acquired the Prospect Property in December 2004, as part of a 1031 exchange and, upon ownership, began renting the Prospect Property.  My intention was to rent the Prospect Property for two years, and then possibly make it my primary family residence.

4.   My daughter became best friends with a girl whose father, Jim Sciaroni, became close friends with me.   Sciaroni and I agreed that if we could find suitable properties, we would build homes adjacent to one another to create an informal family community.  In December 2006, Sciaroni approached me about a property located in Forest Knolls owned by Defendant (Manzanita Property).  The Manzanita Property was approximately 20+ acres, and was owned by Defendant and Steven Finkbine (Finkbine).   Defendant had acquired the Manzanita Property approximately two years before, and he was in the process of splitting the land into four parcels.

5.  Defendant, Finkbine, Sciaroni and I entered into a partnership with respect to the Manzanita Property--with the intention of creating an informal cooperative community setting.  (Exhibit Agreement of Understanding *See* Section 1. Purpose)  Defendant took the lead in developing the Manzanita Property and made representations to all parties that they would have buildable lots by the summer of 2006.  Prior to meeting Plaintiff, Defendant had, and continues to maintain, a long-standing relationship with a well-known attorney and prior county supervisor, Gary Giacomini, to guide him in developing

2

DECLARATION OF MARK MORRISON IN SUPPORT OF PLAINTIFF'S MOTION FOR RELIEF FROM

STIPULATION AND OPPOSITION TO DEFENDANT'S MOTION FOR BINDING ARBITRATION

the Manzanita Property.[1]  The parties requested that I draw up the legal agreement between all of the parties and, I agreed to do so (without charge).  I complied with Rule 3-300 Avoiding Interests Adverse to a Client by having Defendant and his wife sign a disclosure. (Exhibit Disclosure Agreement)  I never before or since provided any legal services for Defendant or his wife.  I neither billed nor have been paid for those or any services since that time.[2]  Other than the initial Manzanita Agreements, I did not provide any legal services to Defendant or the partnership.

6. Defendant was concerned that deeding the Manzanita property into each of the parties' names would hinder his ability to split the lot due to political and environmental concerns, and Sciaroni and I wanted the option to have our money returned in the event Defendant failed to deliver buildable lots.  As a result, Sciaroni and I made a secured loan to Defendant along with an option to purchase two lots.  Sciaroni and I agreed to loan Defendant a total of $725,000 as follows:  $475,000 upon execution of the note and $250,000 deferred payments.  Sciaroni loaned his half of the $250,000 or $125,000 in a timely manner.  Defendant and I made an oral agreement that I would make his $125,000 loan upon the sale of the Prospect Property or earlier receipt of funds from other sources. In the interim (and reflecting the oral agreement), I paid Defendant monthly interest on the $125,000 and (once that sum was reduced) on the $83,000. (Exhibit Checks).  Upon Defendant and I entering into the first Prospect Agreement, Defendant and I agreed that monthly interest payments were no longer necessary since Defendant would be receiving

---

[1] Since retiring as supervisor, Giacomini heads the Marin office of a San Francisco-based law firm.  He has served as a paid land-use consultant to a number of high-profile developers, including George Lucas' expansions in Nicassio.

DECLARATION OF MARK MORRISON IN SUPPORT OF PLAINTIFF'S MOTION FOR RELIEF FROM

STIPULATION AND OPPOSITION TO DEFENDANT'S MOTION FOR BINDING ARBITRATION

cash flow from the Prospect Agreement.  Defendant has failed to provide Finkbine, Sciaroni or me with buildable lots.

7.  Once I began constructing the Prospect Property, Defendant asked me if he could work on the project, as he needed money.  I had hired a licensed contractor, Paul Warren, to act as the general contractor on the job.   Defendant and Paul Warren began having personal conflicts, to the point of threatening to physically abuse the other.  Defendant convinced me that Paul Warren was not fit for the job so I ended the working relationship between him and Paul Warren.  Defendant then made a proposal to me that he act as the general contractor, which I declined.  (Exhibit Emails).  I brought several longtime friends from Southern California and Oregon to help me build the house.  Defendant continued to ask me if he could act as the general contractor for the Prospect Property. (Exhibit Emails).  After several emails and conversations with Defendant,we entered into a written agreement on June 21, 2006, and then we entered the Final Agreement on December 5, 1962.

8.  I had 100% ownership of Prospect prior to meeting Defendant and neither defendant, Finkbine nor Sciaroni were ever involved with the Prospect Property.

9.  I entered into the Manzanita Agreement with Defendant, Finkbine and Sciaroni, not for the purpose of developing "properties in Northern California," but simply to create family homes for each of the parties as part of the Manzanita agreement.

---

[2] I am a civil litigation attorney focusing on consumer protection in the areas of elder abuse, mass action and personal injury.

STIPULATION AND OPPOSITION TO DEFENDANT'S MOTION FOR BINDING ARBITRATION

Dated:  7-11-08

By: /s/Mark Morrison
Mark Morrison

5

## AGREEMENT OF UNDERSTANDING
### *Manzanita*

**THIS AGREEMENT OF UNDERSTANDING of Manzanita** (the "Agreement") is made and effective as of December 13, 2005, by and between Uli Zangpo ("Uli"), Jennifer Baker ("Jennifer"), Jim Sciaroni ("Jim") and Mark Morrison ("Mark") (collectively, the "Parties"), and is made with reference to the following facts:

## RECITALS

A. Uli and Jennifer, husband and wife, own real property located in San Geronimo, California with assessor's parcel number 169-331-15 and are in control of real property with assessor's parcel number 169-262-07 and are in the process of creating 4 legal buildable parcels of real property;

B. Jim and Mark have financial capital, legal, business, management and real estate management skills; and

C. The Parties desire to support each other in the entitlement to 4 legal buildable parcels of real property so that each Party and Steven Finkbine and Sandra Simich ("Steven and Sandra") may acquire ownership of a parcel of real property for the development of a residence;

## AGREEMENT

**NOW, THEREFORE,** in consideration of the above recitals and the covenants, terms, conditions and agreements herein contained, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties do hereby agree as follows:

1. **Purpose.** The Parties are memorializing their understanding of past conversations with respect to the Property. The intention of the Parties is to work together in creating four legal buildable parcels of real property so that Jennifer and Uli, Jim, Mark and Steven and Sandra each have one parcel to build a single family residential home along with other legal structures such as a garage, guest cottage and barn. Each person will end up with one lot attached to approximately 3.7 acres and several common acres made up of the difference between the total acreage of four lots minus the 22.71 acres of existing land and the Extra Lot (the "Commons"). The intention of the Parties is to work together to create useable community space with the Commons facilities and structures such as a barn, solar power, wind power, water wells, water storage, fruit orchard, garden and living pools. Once the 4 parcels have been properly deeded to the four parties referred to in this Agreement, all parties will meet and agree upon an organizational format for handling Commons issues.

2. **Property.** The subject of this Agreement is real property commonly identified as assessor's parcel number 169-331-15 and is 22.71 acres located in San

Geronimo, California and more particularly identified as Exhibit A (the "Property"). The location of the two parcels is tentatively set as drawn on exhibit "B" and is made a part of this Agreement, but Jennifer and Uli will work with Mark and Jim in creating other possible locations for the Lots, if Mark or Jim desire an alternative site and a suitable one is available.

3.    **Extra Lot.** In addition to the three lots to be divided from the Property, an additional parcel of real property commonly identified as assessor's parcel number 169-262-07 is part of this Agreement (the "Extra Lot"). Jennifer and Uli have entered into a contract with the owner of this property, Steven and Sandra, and have control of the Extra Lot with the intention of making it one of the four lots.

4.    **Extra Lot Strategy.** The Extra Lot will be given acreage from the Property in a lot line adjustment currently in process allowing for a home site above Manzanita Avenue with view and Southwest sun exposure. The Option Agreement will include the purchase of the Extra Lot post lot line adjustment and one of the three Lots from the Property. The total acreage of these two lots will be approximately 7.40 acres. For example, if the Extra Lot is .80 acres, the Lot from the Property will be approximately 6.60 acres. After homes are built on these properties, either Jim or Mark will make a lot line adjustment such that each of these two lots will be approximately 3.7 acres. Each of these two lots will be ascribed rights via easements to the Commons. All four parcel owners will work together to come to an agreement on mutually agreed upon uses and conditions of use relative to each other including the use of easements.

5.    **Obligations of Uli and Jennifer.** Jennifer and Uli agree to do as follows:

   a.   Maintain responsibility for the entitlement process of splitting the Property from one parcel into three legal parcels with three separate deeds. In addition to splitting the Property into three parcels, the Extra Lot will be given a portion of the Property to create a fourth legal parcel and these four parcels will be the subject of this Agreement;

   b.   Maintain responsibility for the entitlement process of making a lot line adjustment by increasing the size of the Extra Lot by adding additional acreage from the Property;

   c.   Maintain the Property free of liens and encumbrances with the exception of the Note and Trust Deed referred to in this Agreement;

   d.   Maintain the December 2003 and April 8, 2005 landslides resulting in a settlement agreement with Marin Municipal Water District October 2005;

   e.   Maintain any required payments of the Note;

   f.   Give Jim and Mark and option to purchase real property attached as Exhibit B and is made a part of this Agreement;

   g.   Give Jim and Mark a promissory note and trust deed attached as Exhibit C and is made a part of this Agreement;  and

   h.   Make a good faith effort to fulfill the intention of the Parties to this Agreement.

6.    **Obligations of Jim and Mark.** Jim and Mark agree to do as follows:

a. Lend Jennifer and Uli $725,000 per the promissory note secured by the trust deed referred to above;

b. Pay Twenty Five Percent (25%) of the Property taxes per the Option to Purchase Agreement;

c. Support Jennifer and Uli in whatever way possible using their unique skills in the entitlement process; and

d. Make a good faith effort to fulfill the intention of the Parties to this Agreement.

7. **Indemnification.** Uli and Jennifer will indemnify and hold harmless Jim and Mark against, and in respect of, claims, losses, expenses, costs, obligations, and liabilities they may incur by reason of Uli or Jennifer's breach of or failure to perform any of its warranties, guaranties, commitments, or covenants in this Agreement, or by reason of any act or omission of them, or any of their successors or assigns that constitutes a breach or default under, or a failure to perform, any obligation, duty, or liability of any of Jim or Mark under this Agreement and with respect to the December 2003 and April 8, 2005 landslides and any further damage resulting therefrom, but only to the extent to which Buyer expressly assumes these obligations, duties, and liabilities under this Agreement.

8. **Right of Indemnification Party to Defend.** If a claim shall be made to which the foregoing indemnification provisions relate, the Party or Parties demanding indemnification shall promptly notify the Party or Parties from whom indemnification is demanded, and if such other Party or Parties object in writing within thirty (30) days after such notice is given, the Party or Parties demanding indemnification shall not pay such claim or effect a compromise thereof so long as such other Party or Parties thereafter in good faith contest the claim. The indemnifying Party or Parties shall have the right to assume, at their own expense, the entire control of any such contest and any compromise or settlement thereof, and the Party or Parties demanding indemnification shall cooperate fully to make available all pertinent information to the indemnifying Party or Parties. Any such contest shall take into account the continuing business interest of all parties to this Agreement. The Party or Parties demanding indemnification shall have the right to have their counsel advise and consult with the indemnifying Party or Parties and their counsel in such matter. If, after notice of such claim has been given, the Party or Parties from whom indemnification is demanded do not object to the payment of such claim within such period and do not undertake the contest thereof as above provided, or if such Party or Parties shall not pay such claim after compromise or judgment, the Party or Parities demanding indemnification may pay, compromise or contest the same, and the indemnifying Party or Parties shall, on demand, reimburse the Party or Parties demanding indemnification for their payment of, and reasonable expenses incurred in connection with, such claim.

9. **Exit Strategy.** In the event Jennifer and Uli are unable meet their obligations with respect to the lot line adjustments and creating four legal buildable

parcels with the intention of the Parties, Jennifer and Uli will honor their commitment under the Promissory Note.

10. **Agreement Voluntary and By Representation.** In executing this Agreement and all other documents or instruments required by this Agreement, the Parties have not acted under any misapprehension, confusion or doubt as to the effect thereof, and are acting freely and voluntarily and under no coercion or duress. Each Party has had the right to secure the services of counsel of its own choosing prior to the execution of this Agreement.

11. **Amendments.** The provisions of this Agreement may be amended only if approved by the Parties and all persons who are shareholders of record of the Company as of the time of the proposed amendment. Any amendment of this Agreement will be in writing, dated and executed by all of the Parties. If any conflict arises between the provisions of any amendment and the Agreement as previously amended, the most recent provisions will control.

12. **Compliance with Laws.** Each Party shall comply with the requirements of all applicable laws, ordinances and regulations of the United States or any state, country or other governmental entity. This section incorporates by reference all provisions required by such laws, orders, rules, regulations and ordinances. Each Party agrees to indemnify and hold any other Party harmless from and against any and all claims, actions or damages, including reasonable attorneys' fees, arising from or caused by any Party's failure to comply with the foregoing.

13. **Construction and Interpretation of Agreement.** This Agreement has been prepared jointly by the Parties who acknowledge that they are of equal bargaining strength and the same shall not be construed for or against any Party hereto. The language in all parts of this Agreement will be in all cases construed simply according to its fair meaning and not strictly for or against any Party. Whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender. The captions of the sections of this Agreement are for convenience only and will not affect the construction or interpretation of any of the provisions herein.

14. **Cooperation.** Each Party agrees to cooperate in good faith with the other, and to execute and deliver such further instruments, and perform such other acts as may be reasonably necessary or appropriate to consummate and carry into effect the transaction contemplated by this Agreement.

15. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original, but all of which together will constitute one and the same instrument.

16. **Covenants and Conditions.** All of the provisions of this Agreement shall be construed to be conditions as well as covenants as though the words specifically expressing or imparting covenants and conditions were used in each separate provision.

17. **Entire Agreement.** This Agreement contains the entire and complete understanding between the Parties concerning its subject matter and all

representations, agreements, arrangements and understandings between or
among the Parties, whether oral or written, have been fully merged herein and
are superseded hereby.

18.    **Executed Copy.**  Any fully executed photocopy or similar reproduction of this
Agreement shall be deemed an original for all purposes.

19.    **Force Majeure.**  Neither Party shall be deemed to be default of or to have
breached any provision of this Agreement, nor shall the Agreement terminate,
solely as a result of any delay, failure in performance or interruption of
service, resulting directly or indirectly from acts of God, acts of civil or
military authorities, civil disturbances, wars, strikes or other labor disputes,
fires, transportation contingencies, laws, regulations, acts or orders of any
government, or agency or official thereof, other catastrophes or any similar
occurrences beyond the Parties' reasonable control.

20.    **Governing Law.**  This Agreement shall be construed in accordance with, and
governed by, the laws of the State of California.  Not only contractual claims
and disputes, but all claims and disputes arising out of or in connection with
this Agreement shall be governed in accordance with, and by, the laws of the
State of California.

21.    **Notices.**  All notices, requests, demands or other communication (collectively,
"Notice") given to any Party pursuant to this Agreement will not be effective
unless given in writing to the Parties at their respective addresses as set forth
below.  Notice will be deemed duly given when delivered personally or by
telegram, telex or courier, or, if mailed, 48 hours after deposit in the United
States mail, certified mail, postage prepaid.  The addresses of the Parties for
the purpose of providing Notice pursuant to this section may be changed from
time to time by Notice to the other Party duly given in the foregoing manner.
Uli and Jennifer
PO Box 567
25 Morelos Ave.
Forest Knolls, CA 94933
(415) 488-4772
palixent@comcast.net
Mark Morrison
524 San Anselmo AVE, No. 224
San Anselmo, CA 94960
415-460-1056
mark@markmorrisonlaw.com
Jim Sciaroni
19 Savannah AVE
San Anselmo, CA  94960
(415) 457-2816
jsciaroni@sbcglobal.net
Steven Finkbine and Sandra Simich
29 Bolinas RD
Fairfax, CA 94930

415-454-6901
steven@alchemistlab.com

22.  **References.**  The recitals and all exhibits, attachments or other documents
referenced in this Agreement are fully incorporated into this Agreement by
reference.  Unless expressly set forth otherwise herein, all references herein to
a "day," "month" or "year" will be deemed to be a reference to a calendar day,
month or year, as the case may be.  Unless expressly set forth otherwise
herein, all cross-references herein will refer to provisions within this
Agreement, and will not be deemed to be references to the overall transaction
or to any other agreement or document.

23.  **Remedies.**  All rights, remedies, undertakings, obligations, options,
covenants, conditions and agreements contained in this Agreement will be
cumulative and no one of them will be exclusive of any other.

24.  **Severability.**  Each provision of this Agreement is intended to be severable
and if any term or provision herein is determined invalid or unenforceable for
any reason, such illegality or invalidity will not affect the validity of the
remainder of this Agreement and, wherever possible, intent will be given to
the invalid or unenforceable provision.

25.  **Successors.**  This Agreement shall inure to the benefit of and be binding upon
the Parties hereto and their respective and permitted successors, assigns, heirs,
executors, administrators, and personal representatives.

26.  **Time of Essence.**  Time is of the essence with respect to the performance of
every provision of this Agreement.

27.  **Dispute Resolution.**  Each Party waives the right to trial by jury in any action
or proceeding between each of the Parties, on one side, and the other Parties
on the other, based upon, arising out of, or in any way relating to this
Agreement. This Agreement will be interpreted in accordance with California
law, including all matters of constructions, validity, performance and
enforcement, without giving effect to any principles of conflict of laws.  Any
dispute or proceeding concerning this Agreement, or any and all claims and
disputes arising out of or in connection with this Agreement will be resolved
by binding arbitration to be held in Marin County, California.  Any party may
demand arbitration through written notice sent by certified mail to the other
(an "Arbitration Demand").  Within 15 days after the date that the Arbitration
Demand is first mailed, each of the parties will confer to select a mutually
acceptable arbitrator from the Judicial Arbitration and Mediation Services
("JAMS").  If JAMS is unwilling or unable to provide an arbitrator, the parties
will confer to select another arbitrator.  If the parties cannot agree to a
mutually acceptable member from the JAMS panel of retired judges, a list and
resumes of available mediators with substantial experience in mediating
claims of the type at issue between the Parties, numbering one more than there
are Parties, will be sent to the Parties, each of whom will strike one name
leaving the remaining name as the mediator.  If ore than one name remains, or
if one Party refuses to participate in the selection process, JAMS will appoint

an arbitrator and such appointment shall be binding on the Parties. The arbitrator and the arbitration will be governed by the following rules:

a. If JAMS is unable or unwilling to select an arbitrator, the Presiding Judge of the Marin County Superior Court shall select the arbitrator upon the request of either party, and such selection shall be binding on the parties;

b. The arbitrator so selected will schedule the arbitration hearing within 120 days after he or she is first selected;

c. The parties will not be permitted any written discovery or depositions of any kind;

d. The arbitrator will have authority to make a binding determination even if the parties do not appear at the arbitration and may also grant any remedy or relief that the arbitrator reasonably believes to be just or appropriate, provided that such remedy or relief is within the scope of this Agreement;

e. The arbitrator must relax the California Evidence Code and the rules of judicial procedure;

f. The arbitration shall be by a single neutral arbitrator;

g. Either party shall within 15 days of receipt of the notice of hearing have the right to demand in writing, served personally or by registered or certified mail, that the other party provide a list of witnesses it intends to call designating which witnesses will be called as expert witnesses and a list of documents it intends to introduce at the hearing provided that the demanding party provides such lists at the time of its demand. A copy of such demand and the demanding party's lists shall be served on the arbitrator;

h. Such lists shall be served personally or by registered or certified mail on the requesting party 15 days thereafter. Copies thereof shall be served on the arbitrator;

i. Listed documents shall be made available for inspection and copying at reasonable times prior to the hearing;

j. Time limits provided herein may be waived by mutual agreement of the parties if approved by the arbitrator;

k. The failure to list a witness or a document shall not bar the testimony of an unlisted witness or the introduction of an undesignated document at the hearing, provided that good cause for omission from the requirements of subparagraph (g) is shown, as determined by the arbitrator;

l. The authority of the arbitrator to administer and enforce this paragraph shall be as provided in subdivisions (b) to (e), inclusive, of Section 1283.05 of the Code of Civil Procedure;

m. The neutral arbitrator may adjourn the hearing from time to time as necessary. On request of a party to the arbitration for good cause, or upon his own determination, the neutral arbitrator may postpone the hearing to a time not later than the date fixed by the agreement for making the award, or to a later date if the parties to the arbitration consent thereto;

n. The neutral arbitrator shall preside at the hearing, shall rule on the admission and exclusion of evidence and on questions of hearing

7

procedure and shall exercise all powers relating to the conduct of the hearing; and

o. Testimony of witnesses shall be given under oath. All fees and expenses of the arbitration will be paid equally by the parties participating in the arbitration. At the conclusion of the arbitration, the arbitrator will award the prevailing party its costs and attorneys' fees, including all arbitration costs. If the arbitration award is not paid within 90 days after the arbitration is made, the prevailing party may convert the award into a judgment and execute upon that judgment. The prevailing party will also be entitled to all of its post judgment attorneys' fees and costs incurred in collecting the judgment.

JENNIFER H. BAKER                              DATED: 12-15-05

ULI ZANGPO                                     DATED: 15 Dec 05

JIM SCIARONI                                   DATED: 12-13-05

MARK MORRISON                                  DATED: 12-13-05

ACKNOWLEDGED

STEVEN FINKBINE                                DATED: 12-15-05

SANDRA SIMICH                                  DATED: 12-15-05

Exhibit A

ESCROW NO. 253331 DM

ALL THAT CERTAIN real property situate in the County of Marin, State of California, described below as follows:

Beginning at the Southerly corner of Lot 31, as shown upon that certain Map entitled "Map Number Six of San Geronimo, a Subdivision of a Portion of San Geronimo Rancho, Marin County, California", filed for record June 8, 1927 in Volume 5 of Maps, at Page 45, Marin County Records; thence Easterly 40 feet, more or less, to the most Westerly corner of Lot 3, as shown upon the last mentioned map; thence Southeasterly along the Northeasterly line of Manzanita Avenue to the Southeasterly corner of Lot 8, as shown on said map; thence Northeasterly along the Southeasterly line of Lot 8, North 46° 39' 30" East, 60.00 feet to the most Westerly corner of Lot 9; thence along the Southerly line of Lots 9, 10 and 11 of said map, South 42° 46' East 225.60 feet and South 61° 31' East 102.22 feet to the most Southerly corner of said Lot 11; thence along the Southeasterly line of Lot 11, North 38° 55' East 195 feet to the Southerly line of Juniper Avenue; thence Easterly along said Southerly line to the Northeasterly corner of Lot 20, as shown on said map; thence continuing along the Southerly line of Juniper Avenue, South 1° 25' East 122.20 feet; thence leaving the line of Juniper Avenue, South 1° 25' East 450.00 feet; thence South 56° 05' West 600.00 feet; thence North 37° 35' 56" West 1508 feet, more or less, to the Southwesterly extension of the Southeasterly line of said Lot 8; thence Northeasterly along said line 150 feet, more or less, to the Southerly line of said Manzanita Avenue; thence Northwesterly along said line to the point of beginning.

Excepting therefrom that certain parcel of land shown as Parcel 16 in the Deed from San Geronimo Valley Water Company, a corporation to The Marin Municipal Water District, a public corporation, recorded July 8, 1952 in Book 751 of Official Records at Page 421, Marin County Records, and more particularly described as follows:

Beginning at the most Westerly corner of Lot 17, as shown upon that certain Map entitled "Map Number Six of San Geronimo, a Subdivision of a Portion of San Geronimo Rancho, Marin County, California", filed for record June 8, 1927 in Volume 5 of Maps, at Page 45, Marin County Records; running thence North 36° 13 ½' East along the Northwesterly line of said lot, 61.89 feet; thence South 53° 46 ½' East crossing and subdividing the said Lot 17 for a distance of 110 feet to the Southeasterly line of the said Lot 17; thence South 36° 13 ½' West along the last mentioned line 61.89 feet to the most Southerly corner of the said Lot 17; thence North 53° 46 ½' East 110 feet to the point of beginning.

Further excepting that certain parcel of land described in the Deed from Lagunitas Development Company, a corporation to Marin Municipal Water District, a public corporation, recorded July 25, 1957 in Book 1130 of Official Records at Page 310, Marin County Records, and more particularly described as follows:

Beginning at the most Westerly corner of Lot 17, as shown upon that certain Map entitled "Map Number Six of San Geronimo, a Subdivision of a Portion of San Geronimo Rancho, Marin County, California", filed for record June 8, 1927 in Volume 5 of Maps, at Page 45, Marin County Records; running from said point of beginning along the Southerly line of said Lot 17, South 53° 46 ½' East 60.00 feet; thence leaving said Southerly line of Lot 17, South 36° 01 ½' West 40.00 feet, North 53° 46 ½' West 60.00 feet and North 36° 01 ½' East 40.00 feet to the point of beginning.



RECORD OF SURVEY

LANDS OF BAKER/ZANFORD D.N. 03-0151027

SAN GERONIMO

MARIN COUNTY-CALIFORNIA

MARCH 2005

SHEET 1 OF 1

**AGREEMENT OF DISCLOSURE,
WAIVER OF CONFLICT OF INTERESTS
AND
CONSENT TO REPRESENTATION**

**THIS AGREEMENT OF DISCLOSURE, WAIVER OF CONFLICT OF INTERESTS AND CONSENT TO REPRESENTATION** (the "Agreement") is made by Mark Morrison ("Mark"), and Uli Zangpo ("Uli"), Jennifer Baker ("Jennifer"). The aforementioned will be referenced to collectively as "Parties."

**1.    Introduction**

Mark, as a licensed California attorney, is governed by the ethical considerations and disclosure requirements contained in the California Rules of Professional Conduct, which, inter alia, state:

**Rule 3-300.  Avoiding Interests Adverse to a Client**

A member shall not enter into a business transaction with a client, or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:

(A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and

(B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and

(C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

**Rule 3-310.  Avoiding the Representation of Adverse Interests**

A. For purposes of this rule:

(1) "Disclosure" means informing the client or former client of the relSharonnt circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;

(2) "Informed written consent" means the client's or former client's written agreement to the representation following written disclosure;

(3) "Written" means any writing as defined in Evidence Code section 250.

B.  A member shall not accept or continue representation of a client without providing written disclosure to the client where:

(1) The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or

(2) The member knows or reasonably should know that:

(a) the member previously had a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; and

(b) the previous relationship would substantially affect the member's representation; or

(3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially to resolution of the matter; or

(4) The member has or had a legal, business, financial, or professional interest in the subject matter of the representation.

C. A member shall not, without the informed written consent of each client:

(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict: or

(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict: or

(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter to adverse to the client in the first matter.

D. A member who represents two or more clients shall not enter into an aggregate settlement of the claims of or against the clients, except with their without the informed written consent of each client.

E. A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

F. A member shall not accept compensation for representing a client from one other than the client unless:

(1) there is no interference with the member's independence of professional judgment or with the client lawyer relationship; and

(2) Information relating to representation of the client is protected as required by Business and Professions Code section 6068, subdivision (e); and

(3) The member obtains the client's informed written consent, provided that no disclosure or consent is required if,:

(a) such nondisclosure is otherwise authorized by law; or

(b) the member is rendering legal services on behalf of any public agency which provides legal services to other public agencies of the public.

2.    **Parties**
      The parties to this Agreement are as follows:

| PARTY | STATUS | REFERRED TO AS |
|---|---|---|
| Mark Morrison<br>524 San Anselmo AVE,<br>No. 224<br>San Anselmo, CA 94960<br>415-460-1056<br>mark@markmorrisonlaw.com | Licensed attorney who is drafting agreements relating to the Treat Venture, but has talked with Sharon about her being a defendant in a legal complaint relating to her teaching yoga | "Mark" |
| Uli and Jennifer<br>PO Box 567<br>25 Morelos Ave.<br>Forest Knolls, CA 94933<br>(415) 488-4772<br>palixent@comcast.net | Party to the Manzanita Agreements | "Jennifer"<br>"Uli" |

3.    **Relevant Circumstances for Actual or Potential Conflicts**
      **a.**    Mark is an attorney licensed in California. Mark has never represented Jennifer or Uli in a legal matter. Mark and Sharon are entereing into a business relationship requiring the drafting of several legal documents and Mark is drafting those documents for the benefit of those agreements known as the Manzanita Agreements relating to splitting a 22.71 acre parcel of land into three parcels located in San Geronimo, CA.

      **b.**    Mark has told Jennifer and Uli of the potential and actual conflicts ("conflicts") with respect to his drafting legal documents as a licensed California attorney.

      **c.**    Mark advises Jennifer and Uli to have independent counsel represent her in this matter as a result of these conflicts.

      **d.**    In addition to the above-described conflicts of interest resulting between individuals or entities indicated by their respective existing or proposed relationships, there exist inherent conflicts of interest between them with respect to the following, which each Party to this Agreement recognizes and acknowledges:

      **(1)**    Mark has obtained or may in the future obtain confidential information in the course of his drafting the legal documents relating to the Manzanita

Agreements regarding each of the above-stated Parties which could possibly be used to the legal and/or economic disadvantages of one or more of the Parties;

(2)    Mark, by accepting or continuing his legal drafting, could acquire an adverse pecuniary interest; and

(3)    Mark's drafting of the legal documents may have some disadvantageous economic or other effect on the existing or potential partners, shareholders, other investors or heirs of the Parties.

**4.    Waiver of Conflict and Consent to Representation**

a.    Jennifer and Uli, in all capacities as indicated alongside their names in Section 2, acknowledges all facts and circumstances recited, including, but not limited to, the past, present or future conflicts of interest which could arise by virtue of Mark's providing legal services.  After reasonable reflection and analysis, Jennifer and Uli consent to Mark's drafting of the legal documents and expressly waives any conflict interest which may result.

b.    Jennifer and Uli warrant and represent to Mark that they have all capacity or authority, which may be required under the law, to enter into this Agreement, and does so on the basis of knowledge and information believed to be adequate, and after having had the opportunity to both verify such knowledge and information as well as to consult with independent counsel, and hereby further agrees to indemnify and hold Mark harmless from any costs, fees or expenses, including reasonable attorney's fees, which Mark may incur by virtue of the failure of such warranty and representation.

c.    Each and every Party further agrees to notify each and every other Party of any future, actual, or potential conflicts as they arise and to resolve them as soon as practicable.

JENNIFER H. BAKER                    DATED: 12-15-05

ULI ZANGPO                    DATED: 15 Dec 05

MARK MORRISON                    DATED: 12-13-05

4

2:00 PM **Morrison Legal**
07/16/08
Accrual Basis

# Transactions by Account
### As of July 16, 2008

| | Type | Date | Num | Name |
|---|---|---|---|---|
| **Loan Manzanita** | | | | |
| | General Journal | 12/13/2005 | 59 | Cal Land |
| | General Journal | 12/31/2005 | | Cal Land |
| | Check | 01/04/2006 | 1873 | Cal Land |
| | Check | 01/18/2006 | 1889 | Uli Zangpo |
| | Check | 02/14/2006 | 1906 | Uli Zangpo |
| | Check | 02/14/2006 | 1907 | Uli Zangpo |
| | Check | 04/18/2006 | 1942 | Uli Zangpo |
| | Check | 04/19/2006 | 1946 | Uli Zangpo |
| | Check | 04/25/2006 | 1951 | Uli Zangpo |
| | Check | 05/02/2006 | 1957 | Uli Zangpo |
| | Check | 06/13/2006 | 1988 | Uli Zangpo |
| | Check | 06/30/2006 | 2003 | Uli Zangpo |
| | Check | 12/13/2006 | 2129 | Marin County Tax Collector |
| | Deposit | 12/29/2006 | | Mark Morrison |
| | Deposit | 05/25/2007 | | Mark Morrison |
| | Check | 04/11/2008 | 3003 | Uli Zangpo |
| Total Loan Manzanita | | | | |
| **TOTAL** | | | | |

**2:00 PM**
**07/16/08**
**Accrual Basis**

# Morrison Legal
# Transactions by Account
### As of July 16, 2008

| Memo | Clr | Split | Amount |
|---|---|---|---|
| **Loan Manzanita** | | | |
| paydown 362.5k-150k=212.5k | | Loan Gentile | 150,000.00 |
| paydown 212.5k-87k=125.5k | | Loan Blanton | 87,000.00 |
| paydown 125,5k-.5k=125k | | Union Bank 9334 | 500.00 |
| interest on 125k | | Union Bank 9334 | 625.00 |
| interest on 125k | | Union Bank 9334 | 625.00 |
| geotech | | Union Bank 9334 | 2,750.00 |
| interest on 125k | | Union Bank 9334 | 625.00 |
| pond liner | | Union Bank 9334 | 1,000.00 |
| paydown 125k-10k=115K | | Union Bank 9334 | 10,000.00 |
| paydown 115k-7k=108k | | Union Bank 9334 | 7,000.00 |
| paydown 108k-25k=83k | | Union Bank 9334 | 25,000.00 |
| interest on 83k | | Union Bank 9334 | 415.00 |
| Property Taxes 2006 | | Union Bank 9334 | 4,821.02 |
| Property Tax Reimbursement Jim Sciaroni | | Union Bank 9334 | -1,205.26 |
| Property Tax Reimbursement Jim Sciaroni | | Union Bank 9334 | -602.63 |
| Property Taxes | | Wells Fargo 9048 | 622.00 |
| Total Loan Manzanita | | | 289,175.13 |
| | | | |
| **TOTAL** | | | **289,175.13** |

**2:00 PM**
**07/16/08**
**Accrual Basis**

**Morrison Legal**

# Transactions by Account
### As of July 16, 2008

|  | Balance |
|---|---|
|  | **Balance** |
| **Loan Manzanita** | **0.00** |
|  | 150,000.00 |
|  | 237,000.00 |
|  | 237,500.00 |
|  | 238,125.00 |
|  | 238,750.00 |
|  | 241,500.00 |
|  | 242,125.00 |
|  | 243,125.00 |
|  | 253,125.00 |
|  | 260,125.00 |
|  | 285,125.00 |
|  | 285,540.00 |
|  | 290,361.02 |
|  | 289,155.76 |
|  | 288,553.13 |
|  | 289,175.13 |
| Total Loan Manzanita | 289,175.13 |
| **TOTAL** | **289,175.13** |

Checks from Mark Morrison to Uli Zangpo between 12-31-05 to 4-11-08 relating to Manzanita.

Payments to Cal Land not included.

**MARK A. MORRISON**
524 SAN ANSELMO AVE., NO 224
SAN ANSELMO, CA  94960

11-49  328
1210
3281029334

1889

DATE 1-16-06

PAY TO THE
ORDER OF  ULI Zangpo                          $ 625—

Six Hundred Treny Five _____ DOLLARS

UNION BANK OF CALIFORNIA
KENTFIELD  #328
830 COLLEGE AVENUE, KENTFIELD, CA 94904
800 238 4486

PRIORITY
Banking

FOR _____

⑈121000497⑈ 3281029334⑈  1889  ⑈000006 2500⑈

---

**MARK A. MORRISON**
524 SAN ANSELMO AVE., NO 224
SAN ANSELMO, CA  94960

11-49  328
1210
3281029334

1906

DATE 2-13-06

PAY TO THE
ORDER OF  Uli Zangpo                          $ 625—

Six Hundred Treny Five ___ DOLLARS

UNION BANK OF CALIFORNIA
KENTFIELD  #328
830 COLLEGE AVENUE, KENTFIELD, CA 94904
800 238 4486

PRIORITY
Banking

FOR _____

⑈121000497⑈ 3281029334⑈  1906  ⑈000006 2500⑈

NCSC 02/14/06
2424347003

**MARK A. MORRISON**
524 SAN ANSELMO AVE., NO 224
SAN ANSELMO, CA 94960

11-49 328
1210
3281029334

1927

DATE 3-11-06

PAY TO THE
ORDER OF _U/ibaugm_____ $ 625-

_Six Hundred Twenty five_____ DOLLARS

UNION BANK OF CALIFORNIA
KENTFIELD #328
830 COLLEGE AVENUE, KENTFIELD, CA 94904
800 238 4486

PRIORITY
Banking

FOR _____

⑈121000497⑈ 3281029334⑈ 1927 ⑈00000062500⑈

NCSC 03/30/06
2424677421

**MARK A. MORRISON**
524 SAN ANSELMO AVE., NO 224
SAN ANSELMO, CA  94960

11-49  328
1210
3281029334

1942

DATE _4-13-06_

PAY TO THE
ORDER OF _Uli Zaypo_                          $ 625—

_Six Hundred Twenty Five_ DOLLARS

UNION BANK OF CALIFORNIA
KENTFIELD #328
830 COLLEGE AVENUE, KENTFIELD, CA 94904
800 238 4486

PRIORITY
Banking

FOR _____

⑈121000497⑈ 3281029334⑈  1942  ⑈0000062500⑈

---

**MARK A. MORRISON**
524 SAN ANSELMO AVE., NO 224
SAN ANSELMO, CA  94960

11-49  328
1210
3281029334

1951

DATE _4-22-06_

PAY TO THE
ORDER OF _Uli Zaypo_                          $ 10,000—

_Ten Thousand_ DOLLARS

UNION BANK OF CALIFORNIA
KENTFIELD #328
830 COLLEGE AVENUE, KENTFIELD, CA 94904
800 238 4486

PRIORITY
Banking

FOR _____

⑈121000497⑈ 3281029334⑈  1951  ⑈0001000000⑈

**MARK A. MORRISON**
524 SAN ANSELMO AVE., NO 224
SAN ANSELMO, CA  94960

11-49  328
1210
3281029334

**1957**

DATE  4-25-06

PAY TO THE
ORDER OF  Uli Zongpo                              $7,000 —

Seven Thousand                                    DOLLARS

**UNION BANK OF CALIFORNIA**
KENTFIELD #328
830 College Avenue, Kentfield, CA 94904
800 238 4486

**PRIORITY**
Banking

FOR

⑈121000497⑈ 3281029334⑈ 1957  ⑈0000700000⑈

**MARK A. MORRISON**
524 SAN ANSELMO AVE., NO 224
SAN ANSELMO, CA  94960

11-49  328
1210
3281029334

1988

DATE 6-12-06

PAY TO THE
ORDER OF  Uli Zangpo                              $ 25,000 —

Twenty Five Thousand                          DOLLARS

UNION BANK OF CALIFORNIA
KENTFIELD  #328
830 COLLEGE AVENUE, KENTFIELD, CA 94904
800 238 4486

PRIORITY
Banking

⑈121000497⑈  3281029334⑈  1988  ⑈0002500000⑈

---

**MARK A. MORRISON**
524 SAN ANSELMO AVE., NO 224
SAN ANSELMO, CA  94960

11-49  328
1210
3281029334

2003

DATE 6-27-06

PAY TO THE
ORDER OF  Uli Zangpo                              $ 415 —

Four Hundred Fifteen                          DOLLARS

UNION BANK OF CALIFORNIA
KENTFIELD  #328
830 COLLEGE AVENUE, KENTFIELD, CA 94904
800 238 4486

PRIORITY
Banking

⑈121000497⑈  3281029334⑈  2003  ⑈0000041500⑈



Checks from Mark Morrison to Uli Zangpo between 5-2-06 to 6-30-06 Pre-Prospect Agreement relating to contractor services.

**MARK A. MORRISON**
524 SAN ANSELMO AVE , NO 224
SAN ANSELMO, CA  94960

11-49  328
1210
3281029334

1956

DATE  4-25-06

PAY TO THE
ORDER OF ___ Uli Zangpo ___ | $1,678.36

One Thousand Six Hundred Seventy Eight    DOLLARS  34/100

UNION BANK OF CALIFORNIA
KENTFIELD  #328
830 COLLEGE AVENUE, KENTFIELD, CA 94904
800 238 4486

PRIORITY
Banking

FOR _____

⑈121000497⑈  328102 9334⑈'   1956   ⑈'000016 7836⑈'



**From:** Mark Morrison <mark@markmorrisonlaw.com>
**Subject:** **RE: Windows Ordered**
**Date:** June 17, 2006 9:19:25 AM PDT
**To:** 'Uli Zangpo'

Uli,

I agree I have been too relaxed about this project up until now and it has cost time and money.  The consequences of this project fall upon me so it is I who must ultimately take the lead so I am now going to step up and do what it takes to make this a fiscally sound project --- right wrong or indifferent it is a pattern I seem to follow as I start weak, but finish strong and now is the time.

I will hold the space for the project and would like your support.  For the moment, I will accomplish the following within one week:  create a strategy, finalize plans and finish the foundation.  After that I will have a clear picture of how to move forward.

I would like your support in the following order:

Allow me to continue using the wall support, lumber racks, jackhammer and rebar bender.
Move the tractor and excavator today so we can finish forming the kitchen corner.
Drill the hole for the piling on the northwest corner.
Finish grading the north back yard for the retaining wall.
Move the stones to the land.
Remove and chip trees.

I need the space to do things this way and would like your support in the process --- we can sit down and talk once I am clear on the best way to proceed.  I have been successful in my life because like you I do things my way --- no ego, just the way it is.

Please enjoy your father's day with Keatsay and Jenny as I will with Kim, Jess and Jake --- Ultimately family, friends and relationships have more meaning than the crazy stuff we get caught up in...

Peace...


**Mark Morrison**
**THE MORRISON LAW FIRM**
mark@markmorrisonlaw.com

524 San Anselmo Avenue, No. 224
San Anselmo, CA 94960
T 415.460.1056
F 415.366.1415

"I went to the woods because I wished to live deliberately, to front only the essential facts of life, and see if I could not learn what it had to teach, and not, when I came to die, discover that I had not lived."  Henry David Thoreau, from *Walden*

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged, pursuant to the American Bar Association Formal Opinion No. 99-413, dated March 10, 1999. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or be a waiver of any applicable privilege as to this communication or otherwise. If you have received this communication in error, please contact the sender at mark@markmorrisonlaw.com  or by telephone at (949) 574-0082 or 415-460-1056. Thank you.

**From:** Uli Zangpo [mailto:palixent@comcast.net]
**Sent:** Saturday, June 17, 2006 12:00 AM
**To:** Mark Morrison
**Subject:** Re: Windows Ordered

Mark,

This is not about friendship, emotional conflict, or drama; it is about cause and effect. It sucks up energy, time and money to be doing projects like setting anchors in concrete without plans; some of them will be in the way, or not needed. The time to go back and fix the mess will be more than twice as long as doing it right and getting it right as a

'one-off'. Because of Paul's slop is the first round, there are hardened 7/8" bolts to remove (plasma-cutter, torch, or many grinding wheels) and reset, and the structure will never be what it should be. At best, 25% of the specified load will be achieved with a shallow epoxy set piece of all-thread. The solutions arising out of the arena of piss-poor plans, hasty strategizing, and an emotionally based sense of what is progress, are heading this project into the land of layer upon layer of adapted compromise. A "get-it-done-now-and-deal-with-the-consequences-later" approach will not be quicker or more cost effective.

You placed me in the roll of "General" on this job. Being firm about how this proceeds is a large part of what I'm to do. I'm not asking you for plan files, wiring diagrams, floor schedules, window & door lists, and the freedom to pay for a new architect on the project, to be a petty pain in the ass. I ask for these things in order to make the project moveable in its fundamental progress potential. When you neither produce nor delegate on these requests, you're obstructing the job's execution. There is no need or want for you to pick up insulation and bring it to clutter up the job when wire runs aren't installed. Seal that floor up without putting in all the wires that need to get from one side of the room to the other, and a nightmare of extra work resulting in inferior end result is created. Copper ain't cheap. Voltage drop is real. Extra drilling is time consuming. Stapling insulation is almost not worth considering in the big time-picture.

From what I see, you don't have the tools, or grasp of project overview to efficiently "captain this ship". I have no doubt that you'll ultimately see it finished, but you have a very low probability of maximizing the profit potential, and minimizing the time spent on this job. I'm not attached to being General. I'll take the task seriously if I do it, but I'll be just as happy to put a couple houses up on the Washington Property before year end, or redo my duplex on Maui, if I don't do Prospect. As I look at it, your project is begging for someone to hold it in its entirety in their head as they proceed. Of your friends you brought in on this job, Conrad is the only real potential candidate, but you tell me he's leaving...

Skip is a rough framing guy. Is he the guy to follow when it comes to providing for an expedient finish of the job? His "sawzall-as-eraser" rationale is fiscally frightening to me, no matter how nice a guy he is, or how good a friend he is to you.

I'm available to talk about any or all of the issues on your project, or anything else for that matter, but I'm not giving up my Father's Day over it.

Peace.

Uli

I have complete faith in you and Jake, but I value our friendship more than this old house and I believe this project is creating too much emotional drama and conflict so I will captain this ship as best i can.  I would still like your support on an as needed basis if you are willing --- For example I would like you to down those trees.  If Orin needs work have him give me a call.

I am finalizing the revisions next week and am going to have Conrad and Paige help with the footings and the leveling of the house then they are gone.  Skip and I will see what we can do with the framing from that point on.

Peace...

## Mark Morrison
## The Morrison Law Firm
mark@markmorrisonlaw.com


524 San Anselmo Avenue, No. 224

San Anselmo, CA 94960

T 415.460.1056

F 415.366.1415


"I went to the woods because I wished to live deliberately, to front only the essential facts of life, and see if I could not learn what it had to teach, and not, when I came to die, discover that I had not lived."  Henry David Thoreau, from *Walden*


CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged, pursuant to the American Bar Association Formal Opinion No. 99-413, dated March 10, 1999. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited.  Moreover, any such inadvertent disclosure shall not compromise or be a waiver of any applicable privilege as to this communication or otherwise. If you have received this communication in error, please contact the sender at mark@markmorrisonlaw.com  or by telephone at (949) 574-0082 or 415-460-1056. Thank you.

---

**From:** Uli Zangpo [mailto:palixent@comcast.net]
**Sent:** Friday, June 16, 2006 5:01 PM
**To:** Mark Morrison
**Subject:** Re: Windows Ordered

Jake has three competent architects to choose from who're waiting for the files. Neither Jake nor I share your view of the future based upon subs as viable. There are very few ways to execute this project within two months. Your management style, as manifested to date, is not one of them.

People like Sage should have a cut-list of hundreds of items in front of him on the table of a well set up chop-saw; Skip should have stacks of pre-cut, color coded framing members to work from, or be doing pull down from DEFINED PLANS; Conrad should be filling in the solution gaps where the plans fall off from what is... When all four of us stand around scratching our heads, and getting no resolution, you're burning through money without resultant progress. I am wasting time and ruining tools. Jake & crew is ready to start full full time as of Mon., providing we have plans and a program. I have not the patience nor mental space to do three steps forward, and one back, as a progress method. I will curse and yell every time I have to remove and redo something installed on my watch. I'm unwilling to expend my days in that manner. My time in project flow is easily worth $1500 a day. By my assessment, I'm not worth the cost of replacing my tool wear on the job, as it's going.

The project changes course, or I take my leave of it.

Peace.

Uli


I understand your concern about being blamed for any delays or costs --- Know that I take full responsibility for timing and costs so you are relieved of that responsibility.

I too am concerned about this taking away your time for our future homes --- All I can say is I am greatful for your commitment to this project.  What gives me comfort is knowing that once we have the foundation and framing complete, the rest of the job can be largley subcontracted out with some management of those folks allowing us to focus on the landscaping, which will go smoother than the interior.

Guy is sending auto cad files and I will get them to you asap.

We will get it done sooner than later.

Mark

## Mark Morrison
## The Morrison Law Firm
mark@markmorrisonlaw.com

524 San Anselmo Avenue, No. 224

San Anselmo, CA 94960

T 415.460.1056

F 415.366.1415

"I went to the woods because I wished to live deliberately, to front only the essential facts of life, and see if I could not learn what it had to teach, and not, when I came to die, discover that I had not lived."  Henry David Thoreau, from *Walden*

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged, pursuant to the American Bar Association Formal Opinion No. 99-413, dated March 10, 1999. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited.  Moreover, any such inadvertent disclosure shall not compromise or be a waiver of any applicable privilege as to this communication or otherwise. If you have received this communication in error, please contact the sender at mark@markmorrisonlaw.com  or by telephone at (949) 574-0082 or 415-460-1056. Thank you.

---

**From:** Uli Zangpo [mailto:palixent@comcast.net]
**Sent:** Thursday, June 15, 2006 8:23 AM
**To:** Mark Morrison
**Subject:** Re: Windows Ordered

Mark,

I'm sorry for being so intense about all this. I don't want to participate in a process that leaves you feeling compromised by my support and efforts on your project. I am here to help this process conclude. The fear behind my intensity is that if circumstances and situation result in this project dragging out, I'll end up with blame for the added costs and time, and the building of my family's home will be delayed.

I want this to be a clean execution from project, to done and sold. I'm seeing this as a minor delay in the process of building homes for all of us upon the hill. Ultimately, day in, and day out, my focus is up there. I have wood to mill, trail to build, roads to install, and a slide to repair. I delay that list in order to free you up to be my neighbor.

On Prospect, clean, concise, accurate, and without misstep, is the only recipe I know that will remove this house from our to-do list without dragging the hill property project into stagnation. I can bend Prospect's progress to my will if you let me. If it costs me $$$ to make it happen, so be it. The delay potential costs me more.

I intend Prospect to be a source of mutual gratitude; I'm committed to it with tenacity...

Peace.

Uli

We will have windows and french doors in 3 weeks --- he says we need to pick them up within 2 days of delivery...

I am going to work on the interior door and front door order next followed by skylights and sun tubes --- once i am certain about exact specs i will order those as well...

i feel better now that we have started writing out a strategy that i can see and follow more easily...

i appreciate your support...

## Mark Morrison
## The Morrison Law Firm
mark@markmorrisonlaw.com

524 San Anselmo Avenue, No. 224

San Anselmo, CA 94960

T 415.460.1056

F 415.366.1415

"I went to the woods because I wished to live deliberately, to front only the essential facts of life, and see if I could not learn what it had to teach, and not, when I came to die, discover that I had not lived."  Henry David Thoreau, from *Walden*

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged, pursuant to the American Bar Association Formal Opinion No. 99-413, dated March 10, 1999. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited.  Moreover, any such inadvertent disclosure shall not compromise or be a waiver of any applicable privilege as to this communication or otherwise. If you have received this communication in error, please contact the sender at mark@markmorrisonlaw.com or by telephone at (949) 574-0082 or 415-460-1056. Thank you.

1

*Lead Counsel*
Matthew Kurilich, Bar Number 30172

2

17321 Irvine Boulevard, Suite 115
Tustin CA 92780

3

Tel (714) 734-3715
Fax (714) 734-3716

4

mattkurilich@yahoo.com

5

*Co-Counsel*
Mark Morrison, Bar Number 152561

6

220 Second ST, No. 30
Langley, WA 98260

7

Tel 360-221-0253
Fax 360-851-2010

8

mark@markmorrisonlaw.com

9

10

## UNITED STATES DISTRICT COURT

11

## NORTHERN DISTRICT OF CALIFORNIA

12

13

MARK MORRISON, an individual;

14

Plaintiff,

15

vs.

16

ULI ZANGPO, an individual;

17

Defendants.

18

)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No: 3:08-CV-1945-EMC**

**DECLARATION OF JIM SCIARONI IN SUPPORT OF PLAINTIFF'S MOTION FOR RELIEF FROM STIPULATION AND OPPOSITION TO DEFENDANT'S MOTION FOR BINDING ARBITRATION**

Date:
Time:
Courtroom: C, 15th FLR

19

20

## DECLARATION OF JIM SCIARONI

21

I, JIM SCIARONI, hereby declare under penalty of perjury as follows:

22

1.  I have personal knowledge of the facts set forth herein, and if called upon to do so, I could

23

competently testify to the same.

24

2.  I Graduated from San Jose State in 1972 with a Bachelors of Science in Business. In 1979, I

25

was the founder and CEO of Cascade Forest Products, Inc., a manufacturer and distributor

in the Western United States of an organic chemical free packaged soil products company, which was sold to a public company between 1995 and 1999.

3.  During the summer of 2004, my daughter became best friends with a girl whose father, Mark Morrison (Plaintiff), became close friends with me.  During the fall of 2005, a friend advised me of a property opportunity (the Manzanita property) that might be available in the town of San Geronimo.  After speaking with Uli Zangpo (the defendant and Manzanita property owner) about it and discovering there were 2 intended extra future lots available, I invited Mark Morrison to get involved in the discussions along with me.  We saw it as an opportunity to create an informal community together with Defendant and Jennifer Baker (his wife), and Steven Finkbine and Sandra Simich (Finkbine).  The Manzanita Property was approximately 20+ acres, and was owned by Defendant.  It is my understanding the Defendant had acquired the Manzanita Property approximately two years before I became aware of the project

4.  It is my understanding the Defendant and Finkbine had been friends for some years prior to the time at which I became involved in the project.

5.  Defendant, Finkbine, Plaintiff and I entered into a partnership with respect to the Manzanita Property, with the intention of creating an informal cooperative community setting with 4 separate lots and some "shared community' acreage as well.  Defendant was to be responsible for managing the process of completing the tasks necessary to generate 4 separate buildable lots.  Defendant represented that he would be diligent in completing the tasks necessary to have 4 distinct future lots plus shared common acreage split and ready to proceed with the building design process as soon as 9 months from when we signed the contract in December of 2005, although he added there was no

2

DECLARATION OF JIM SCIARONI IN SUPPORT OF PLAINTIFF'S MOTION FOR RELIEF FROM

STIPULATION AND OPPOSITION TO DEFENDANT'S MOTION FOR BINDING ARBITRATION

guarantee of that schedule and that it could take considerably more time, depending on the circumstances encountered.

6. I had briefly met the Defendant some years prior to getting directed to him regarding the property deal.   When I was in the process of exploring a partnership for the Manzanita property with Defendant and Plaintiff, Defendant had a long-standing relationship with a well-known attorney and prior county supervisor, Gary Giacomini, to guide him in developing the Manzanita Property.[1]  The parties requested that Plaintiff draw up the legal agreement between all of the parties and, he agreed to do so (without charge). Beyond the initial agreements, I am not aware of Plaintiff providing any legal services to Defendant personally or the partnership with respect to the development of Manzanita.  I am not aware of Plaintiff doing any work on Manzanita or being responsible for researching subdivision law with respect to the development of the Manzanita Property. Between December 2005 and March 2007, the partners had several meetings where we discussed the Manzanita project and I acted as the unofficial meeting secretary by taking notes and sending out emails to the partners summarizing the meetings.  There was a discussion at any of the meetings where Plaintiff provided legal counsel or was tasked with any subdivision law map research, preparation or otherwise.

7. Between 2005 and March 2007, Defendant had full responsibility for the entitlement process and the project as a whole and neither Plaintiff, Finkbine nor me were asked at any of the meetings or otherwise to my knowledge, to assist him in any way in the lot split process or otherwise.

3

DECLARATION OF JIM SCIARONI IN SUPPORT OF PLAINTIFF'S MOTION FOR RELIEF FROM STIPULATION AND OPPOSITION TO DEFENDANT'S MOTION FOR BINDING ARBITRATION

8. On December 13, 2005, Plaintiff and I executed an "agreement of understanding – Manzanita" along with Defendant and Finkbine. This agreement also provided for an "option to purchase real estate" agreement giving Plaintiff and I the option to purchase two lots after they were split. This agreement also required Plaintiff and I to make a loan to Defendant secured by a first trust deed on the Manzanita Property. In compliance with the agreements, Plaintiff and I committed to loan Defendant $725,000 as follows: $475,000 was loaned upon execution of the note and $250,000 of deferred loan payments. With respect to the deferred $250,000, I loaned Defendant $125,000. To my knowledge Plaintiff and Defendant had an agreement around Plaintiff's remaining loan of $125,000, which was apparently a verbal agreement of some kind between them.

9. Defendant expressed a concern that recording our option to purchase the Manzanita property lots would hinder his ability to split the lot due to political and environmentalist concerns and because of that we agreed not to have the option to purchase real estate and related agreements recorded. The deed of trust related to the loans was recorded.

10. It is now over 30 months since we signed our agreements and Defendant has to date generated very minimal progress related to the tasks necessary to have the lots split.

11. I have never had any ownership interest of any kind with 30 Prospect, San Anselmo, California and have never been in partnership with Plaintiff with respect to this property.

12. I entered into the Manzanita Agreement with Defendant, Finkbine and Morrison, not for the purpose of developing properties in Northern California, but solely to create family homes for each of the parties as part of the Manzanita agreement.

---

[1] Since retiring as supervisor, Giacomini heads the Marin office of a San Francisco-based law firm. He has served as a paid land-use consultant to a number of high-profile developers,

1    Dated:  8-1-08

2
                                                    By:  /s/Jim Sciaroni
3                                                        Jim Sciaroni

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        5
including George Lucas' expansions in Nicassio.
        DECLARATION OF JIM SCIARONI IN SUPPORT OF PLAINTIFF'S MOTION FOR RELIEF FROM

    STIPULATION AND OPPOSITION TO DEFENDANT'S MOTION FOR BINDING ARBITRATION