**LAW OFFICES OF NEIL JON BLOOMFIELD**
Neil Jon Bloomfield, Esq. (State Bar No. 52235)
901 E Street, Suite 100
San Rafael, CA 94901
Telephone: 415-454-2294
Facsimile: 415-457-5348

Attorneys for Defendant
ULI ZANGPO

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

MARK MORRISON.
    Plaintiff,

vs.

ULI ZANGPO,
    Defendant.

No. CV 08 1945 EMC

**DEFENDANT ULI ZANGPO'S DECLARATION IN OPPOSITION TO REQUEST FOR RECONSIDERATION ON REFERRAL TO ARBITRATION**

Date: September 17, 2008
Time: 10:30 a.m.
Place: Courtroom C, 15th Floor

Uli Zangpo, Defendant herein, declare and state:

    1    It is clear to me that the entire 2005-2006-2007 Prospect financial deal and dealings transaction is both related to and arises from the Manzanita financial deal and dealings. By the Prospect financial deal and dealings I refer to the Plaintiff having pulled me in to help him with his ongoing emergency/speculative building project at 30 Prospect, San Anselmo. By the Manzanita financial deal and dealings I refer to the Manzanita transaction with Plaintiff and myself and others that occurred in December of 2005, and is ongoing.

    2    Here is the interrelationship. Plaintiff approached me because he wanted to join in my plan to build four houses in a Tenancy in Common Community in Marin County. He wanted to buy

the rights to one of the four building sites. I was hoping to obtain the sites if, and only if, I was able to obtain approval for that project. During that approach he indicated he had many sources of funds which included Jim Sciaroni, a furnace class action suit (that Plaintiff was working on), a residence in San Anselmo (that Plaintiff wanted to remodel and sell), and various others in his life that were prepared to make funds available to him.

3    I am a partner in the Manzanita project, first with Steven Finkbine initially in 2004, then later, in late 2005 with Mark Morrison and Jim Sciaroni as well.

4    The Court should choose binding arbitration so that all of the events that took place at Prospect between myself and Mark Morrison are not separated from my partnership with him within the Manzanita agreements, and his role as the legal service providing partner of the partnership. My involvement at prospect was due entirely to my desire to keep Manzanita moving, which required helping my partner to get beyond his financial, emotional, and logistical difficulties. There is a binding arbitration agreement in the Manzanita Memorandum of Understanding that I signed, Mark Morrison signed, and Steve Finkbine and Jim Sciaroni signed. This agreement as I understand it covers any and all disputes related to or arising out of the Manzanita Memorandum of Understanding.

5    I believe that the entire set of agreements between Mark and I are related to and arise out of the Manzanita agreement for the following reasons amongst others:

    a. Mark and I met in connection with his interest in joining into the Manzanita ownership, and he mentioned Prospect as one of his projects and revenue sources at the very outset.

    b. Mark and I together developed a shop in San Rafael, whose purpose was to jointly service the needs of the Manzanita project and the needs of the Prospect project.

    c. Mark stated in 2005 prior to Manzanita funding that he was entering the Manzanita transaction that he would most likely fund part of the $ 250,000 deferred financial commitment on Manzanita from his Prospect property situation, which established a relationship between the two projects from the outset. I was not working at all in any

connection with the Prospect project or with Mark at this early time when Mark disclosed this plan of his as to his preferred method of funding his commitment to the Manzanita project. Mark did not indicate that he would not be able to fund from other sources or that he felt he could not fund Manzanita on time until after he was already in the partnership and we had all signed the memorandum of understanding about Manzanita.

d. The wisdom and desirability of my assisting Mark at Prospect was regularly discussed and debated by and amongst Mark, Steve, and Jim, and myself at numerous Manzanita partnership meetings, before I had more than a very minor peripheral role in Prospect. It was stated at those meetings repeatedly that the reason for my involvement in Prospect was to help Mark meet his delayed funding commitment to Manzanita, to help Mark free himself and his time availability from the stress and constraints of Prospect, and in part later to offset the loss to me caused by that delay in Mark's meeting his financial commitment to me and to the Manzanita partnership.

e. Mark many times agreed in what was or appeared to be his and my joint point of view that by developing the joint work shop in San Rafael for Prospect and Manzanita; and by developing the experience of working together on Prospect, he and I were smoothing the way for subsequent houses to be built on Manzanita; that we were hopefully making all the houses more cost effective; and that the shop would enable us to proceed in both good and bad weather, for the benefit of both the construction needs of the Manzanita common area improvements and the four Manzanita single family homes that we were jointly planning to build, as well as the Prospect project.

f. Prior to December 2005, I had stockpiled a large amount of rocks & aggregate (many hundreds of tons) on the Manzanita property for landslide repair work, trail development, and common area and house improvement needs at Manzanita on the

3

DECLARATION OF ULI ZANGPO OPPOSING
MOTION FOR RECONSIDERATION OF REFERRAL TO ARBITRATION

Manzanita property. In the late Winter/early Spring of 2006, it became apparent that Mark had to purchase rock for fill and stabilization at Prospect. As manager of the Manzanita project, I offered to convey 20-30 tons of that rock to Prospect, to be used by Plaintiff in and for the Prospect project. This was only a small percentage of the rock that I had stockpiled at Manzanita, so the detriment to the Manzanita project from this was minor, only a diversion of my energy to bring the materials to Prospect. At the same time, soils removed from Prospect, and timber removed from Prospect, were brought by me as per Mark's discussions, directions, and approval, to Manzanita, and were stockpiled there for future use in the Manzanita project if and as needed, which saved Mark the cost of disposing of them other than truck time and gas, and also allowed the Manzanita project to reap a small potential benefit from this service to Mark performed by me as a Manzanita partners.

g. It is entirely unlikely that Mark and I would ever have had chosen to work together at Prospect if (1) we had not first entered into the Manzanita agreements, and (2) if Mark did not have needs of me to assist him, which he requested in relationship to his need to provide funds to the Manzanita project; and (3) Mark's need, communicated to me by him to reduce the overbearing stress in his life that Prospect was causing in the face of his and his wife's unexpected pregnancy, all of which made him want to leave town and avoid the stress of project management.

h. The two projects are also interrelated in that Mark, as my partner and a person who had legal expertise and had committed to provide that expertise to me as part of our partnership, drafted virtually all of the documents related to both projects that were signed from the time I met him to this date.

i. The two projects are also interrelated in that I had to slow work on Manzanita to devote time to Prospect. This interrelationship is stated in the email attached to Plaintiff's declaration filed 8-1-08, in which Plaintiff wrote to me:

> " I understand your concern about being blamed for any delay or costs----know that I take full responsibility for timing and costs and you are relieved of that responsibility. .
>
> "I too am concerned about this taking away from time from our future homes---all I can say is I am greatful for your commitment to this project. What gives me comfort is…….:

(Declaration of Mark Morrison, Document 40-2, page 32.)

j. It is of course ironic that the attorney, who on his firm's letterhead and while being my partner and handling the legal needs of my partnership, as per his commitment in the memorandum of understanding, advises me that he absolves me of responsibility for delay and costs, can then sue me for delay and costs. Leaving that oddity aside, for the moment, when Mark says taking away from time from our future homes, he is clearly referring to the Manzanita project. If his own email sent to me in June of 2006 discusses the projects as being interrelated, it is hard for me to understand how Plaintiff can even be permitted to argue they are not interrelated. I think a doctrine of estoppel should apply to prevent him from making that claim. Our future homes were the homes we were building for the four Manzanita partners pursuant to the memorandum of understanding, which is also attached to the declaration of Mark Morrison in connection with this motion. The agreement states,

> "Jim and Mark have financial capital, legal, business management and real estate management skills … and the parties desire to support each other …….".

Pursuant to that commitment, in writing by Plaintiff, Plaintiff did the drafting for all agreements involved between him and me concerning both Prospect and Manzanita, and it was Plaintiff who wanted writings about them, not me. I was helping a friend, trusted attorney, fiduciary, and partner.

k. Plaintiff has attached his own records, which do not establish what our agreements or payments were, and actually describe his transactions with third parties, such as Gentile and Blanton. But what they do establish is that the $ 87,000 he claims somehow was a payment (although never made) that came from Prospect is a payment on Manzanita, which further shows the interrelationship between the two projects.

l. Both transactions arise out of the relationship and trust and confidence that was established by Plaintiff in undertaking to meet the legal needs of our partnership and draft documents relating to our interactive enterprises, during the period from late in 2005 to and including the first portions of 2007 when Plaintiff unilaterally terminated his relationship with me. The facts about this relationship; the pattern where Plaintiff abused his position of trust to draft self serving documents which advantaged him and created undue risk for me; and the reliance I misplaced in trusting Plaintiff are one sequence of events, not two, and cannot really be separated legally factually or otherwise. They have the same core of facts and dealings. The words in the contracts are not effective if improperly obtained, and they are all improperly obtained by Plaintiff.

6    By way of further background regarding Manzanita and Prospect, I hired a land use consultant work on the plan to develop home sites in the Manzanita Project. The consultant is also an attorney but he was not hired for legal advice or for structuring of joint ownership arrangements. He was hired to facilitate the regulatory application process with Marin County and give advice on what would likely succeed and what might not succeed in such applications. His name is Gary Giacomini. My use of his services had been completed prior to joining in partnership with Mark Morrison, and I have not used his services since the partnership with Mark Morrison began

7    I had a prior written agreement with Steve Finkbine for his participation in the process of getting Manzanita from undeveloped land to a parcel permitted for a number of houses. Once the

parcel was permitted it might evolve into separate lots or as a Tenancy in Common ( I preferred tenancy in common because of a potential for reduced tax burden on an ongoing basis).

8    Plaintiff became the legal advisor to the project: to advise on and draft the operative agreements to take the venture from the agreement of two people to the agreement of 4 people. He was the only lawyer who drafted the documents and the documents he drafted make clear that he was lending legal skills to the venture which is in essence a partnership. I am not a lawyer but it is my understanding that once Plaintiff drafted the documents for the venture, advised all 3 other participants on the structure and formative documents (which became a Memorandum of Understanding, a Note, and a Deed of Trust) he was bound by a fiduciary duty to the partnership as well as the duties of a lawyer to clients involved in the partnerships' venture.   Again, I am not a lawyer but as I have come to understand it Plaintiff not being paid for this legal work and advice does not diminish his duties to me and to the partnership or the partners.

9    Plaintiff admits this duty in a Rule 3-300 Disclosure that he furnished me.  The disclosure did not detail all of the conflicts of interest that might arise or were automatically arising. As the drafter of the documents for the Partnership, Plaintiff determined in his capacity as legal advisor that a Deed of Trust and an Option were appropriate.  He determined that his commitment with Jim Sciaroni to jointly fund $725,000.00 to the project would be secured by a Deed of Trust and that a note would be signed. However, he did not in any written disclosure, or otherwise, explain to me that he could foreclose on me or that I could lose my property to him.  He determined how to memorialize his own commitment to fund $725,000.00 and put the last $250,000 in my promissory note to him with due dates spaced out at various times in the first six months of 2006.

10    I needed money to pay off the purchase indebtedness on the Manzanita property and to do the physical work to maintain and upgrade that property, as well as pay for development applications and consultants.  This need was clearly explained to Plaintiff when he undertook the drafting of the Manzanita documents.   It was only partially reflected in the documents, in the form of fine print in a part of the promissory note I signed about future advances, I guess because Plaintiff was more concerned about protecting himself then protecting me.

7

DECLARATION OF ULI ZANGPO OPPOSING
MOTION FOR RECONSIDERATION OF REFERRAL TO ARBITRATION

11    At the time Plaintiff funded the first portion of his investment in Manzanita, and after the Memorandum of Understanding was signed, he disclosed his plan to pay portions of the funds he owed me by funds received from the sale of his property at Prospect. He did not at that time state that he had no other way to fund this repayment or that the funding was contingent upon that project getting sold or refinanced.

12    Only after Manzanita closed and I was contractually committed to Plaintiff, Plaintiff told me that he might not be able to meet his financial commitments to me if he did not achieve his expectations on Prospect. I am not sure if it is really true or not because Plaintiff met his initial funding commitments on Manzanita by borrowing from others. These others showed as the initial beneficiaries of the Note and Deed of Trust on Manzanita that he drafted. As far as I knew, or know today, he could have funded by borrowing from those individuals, by pledging his Note and Deed of Trust from me. It was clear to me only after we became partners on Manzanita that Plaintiff was worried about his Prospect project because it was at that time that said that he could not meet his commitment to me.

13    It was only because of his involvement in Manzanita and his status as my partner in our plan to be a community of four households and eventually living on that parcel of land at that I felt obligated to try to help Plaintiff with his situation at Prospect.

14    Plaintiff had a licensed contractor doing the Prospect project for him—in fact two. And then perhaps still a third after he lost rapport with all others working on the project, including me. He asked for my help as a friend and partner in Manzanita. When my legal advisor and friend asked for help my response was to do what I could and so I did. The help I gave was due to Plaintiff's status as my partner in Manzanita and as part of my efforts to not only help him meet his financial commitment to me, but to also help him in his desire to get out of a project that he identified as a problem. The most accurate and truthful account of his plight at Prospect is in his letter to the City of Anselmo, a copy of which is attached hereto as Exhibit B. His complaint herein is not as honest as that letter.

15     I am not an expert on the "legal status" of items but I do know that Plaintiff knew that I had been a building contractor in other states, that for many years I had decided to no longer be a building contractor, and that I was not licensed to be a building contractor. I relied on Plaintiff as project legal advisor, friend, and partner in Manzanita, to conduct all of our dealings in a way that would not run afoul of any law or regulation. I helped him without seeking or requiring any contracts.

16     Plaintiff made particular representations to me in regard to running afoul of laws and/or regulations and induced me to assist him on his Prospect project. These include, and are not limited to:

- That my role within the Prospect project would be defined as "project manager".
- That he was the "owner builder", and responsible as contractor. The document he filed with the city of San Anselmo was presented to me to verify this in order to allay my fears of being in the position of being targeted as an unlicensed contractor after Paul Warren flipped out about my being brought onto the Prospect project by Mark as an advisor to Mark.
- That any disputes that might arise, would be prevented from going to court by our agreement to mediate or arbitrate any disputes.
- That we were partners in the endeavor to develop our homes upon the Manzanita property, and the Prospect project would be an opportunity to develop a working relationship for the building of our respective future homes.
- That he was morally and ethically opposed to the very idea of suing an individual; never had, and never would sue an individual, certainly not a family friend and partner.

I relied on him in his many roles to meet his duties to me in these respects.

17     I had so much trust and confidence in Mark Morrison because of our friendship that evolved from and after the Manzanita project negotiations and signing (prior to that I did know plaintiff) that I loaned him $100,000 for three weeks. I made said loan on March 12, 2007. (Exhibit A.) I told Plaintiff that I needed both that money and the money he had not paid me from the $725,000 commitment urgently. Instead of paying me the short term loan (which I understood to be

9

DECLARATION OF ULI ZANGPO OPPOSING
MOTION FOR RECONSIDERATION OF REFERRAL TO ARBITRATION

2-3 weeks) and paying the other funds, Plaintiff told me to no longer help with his Prospect project by underhanded methods. He did not repay the short term loan and he did not pay the funds he promised on Manzanita. I have no idea why he refused and still refuses me to pay the $100,000 short term loan but it appears he never intended to repay me and that he planned to fire me or otherwise displace me from continued work upon Prospect prior to taking possession of my loan to himself.

18  I did not require any documentation for my $100,000.00 loan to him because I trusted him as my legal advisor, friend and partner. I simply wrote "bridge loan" on the check. (Exhibit A.) I did request (at my wife's behest) the following day that he draft and sign an agreement for the loan, which he ignored. I did not require any documentation to enable Mark to become one of the 4 portions of the Manzanita project but he volunteered to draw the document up on behalf of all 6 of those who were partners. That action seemed reasonable and appropriate since he had agreed he was providing his legal expertise to help with the venture.

19  The only reason I agreed to help Plaintiff with his needs on his Prospect project was that he was my partner and becoming part of the community we were forming to build homes and live on the Manzanita project. The purpose of helping him was to enable him to pay me what he already owed me on Manzanita not to make money on Prospect. By the same token, I did not expect to lose money on Prospect and Plaintiff assured me repeatedly that I would not.

20  In connection with Manzanita and Mark's status as legal advisor for Manzanita, as well as my fiduciary, partner, and trusted new friend, I sought his advice on numerous items. One item related to tree work and heavy machinery work. In that connection, I confided in him my career situation, my commitment to doing work as a health practitioner in osteopathic related health care, and my commitment to doing my own real estate projects (at times with partners like him) and my assessment that doing work on such a project did not require me to have a contractors license. I relied on him to tell me if the situation was otherwise not only in regard to the work I did and was doing for the Manzanita project but also the work related to emergency removal of fallen trees after

a storm. This was discussed with him in detail and which he advised me and later the homeowner to whom I introduced him.

21   My involvement with Prospect started as providing help to him so that he could follow through on his commitment to me on Manzanita. The help that Mark asked for at Prospect was to advise him in his efforts to supervise a licensed contractor whom he had hired on his own without my involvement. Mark also asked me to help him and this contractor by providing some tools to the project as well as providing excavation work using my own heavy equipment. This is equipment I use on my own projects in which I am in partnership or full ownership. I also gave some advice as a friend with firsthand knowledge of woodwork and construction.

22   None of the agreements that Mark made with me were in fact fair and reasonable as judged from my point of view, which I believe to be the relevant standard for business dealings between a lawyer fiduciary and a layman in circumstances such as mine. Mark does not seem to understand that Rule 3-300 requires that agreements be fair and reasonable, not just that he get a signature on a document. Since I trusted Mark I would pretty much sign whatever he asked me to sign. I never dreamt that he would construct these documents that he prepared and drafted into a scheme to end up with an interest in Manzanita and large sums of money for his personal gain from me. He would not be a partner but a lender capable of foreclosure who could take from me months of hard work, materials and goods without payment. He proclaims himself the "client." Since he did not disclose this possibility to me and he was my trusted advisor and the one providing legal expertise and support to our ventures which I believe in the end he will be stopped from asserting any licensing issues involved with my "supposed" work for him that I thought was part of helping a partner fund his partnership investment that he had promised to pay to me.

23   I do not see how the judicial officer or jury who are ultimately deciding which agreements are enforceable can fairly do so looking only at the tip of the iceberg—the supposed final prospect agreements drafted by the person providing legal expertise and support to my venture in Manzanita, and who asked me to help him on Prospect so that he could complete his financial commitment to me concerning Manzanita.

24     I do not see how he can contend that my involvement in Prospect and all agreements that he drew up and got me to sign about Prospect are not related to and arising from the Manzanita project. I never would have helped at Prospect but for his financial commitment to me on Manzanita. I told him in 2005, before I first looked at Prospect as a favor to him, that I had long ago stopped doing work for clients as a building contractor. It was his job to protect me in that regard, and he did not.

25     Plaintiff has taken a few emails out of context, and particular the use of the word "General". Plaintiff asked me to superintend for him as a construction manager his project at Prospect. Plaintiff certified to San Anselmo that he was doing this as his project, see attached Exhibit B.

26     Plaintiff had mismanaged his project at Prospect from start to when it got all gummed up and he asked me for more and more help as it got gummier and gummier for him. He had two stop work notices on the project, at least. He had building plans that were not "executable" without changes because they were not the same in dimension as the building he was trying to renovate, and they did not conform to the site plan. Additionally, portions of the building had been framed in an improper and unsafe manner. These were all problems that Plaintiff had created for himself, and now wishes to blame me for, because he was able to get me to sign documents that he drew up, and that he knew could implicate me as a potential unlicensed contractor, when he knew I had neither plans or desire to be a contractor, and was not willing to be one, only willing to be a worker on partnership projects that I had an interest in, or on projects for friends, or to help others in emergencies. In fact, it was an emergency that involved a tree falling on a house, where I was asked to come in with heavy equipment I own and use for my own projects or rent to licensed contractors, with me as an operator, for them to work on their projects through me, that was one of the first situations that I sought advise from Plaintiff as my trusted legal advisor and partner.

27     When Plaintiff asked me to help with Prospect, he had a general contractor, and my role was to be quite limited. But, when he found he was out of town a lot and needed more help, he wanted me to work as a project supervisor for him. I did not think working for my partner as a

12

DECLARATION OF ULI ZANGPO OPPOSING
MOTION FOR RECONSIDERATION OF REFERRAL TO ARBITRATION

project advisor and lending equipment and at times as an equipment operator required a license. I am still not sure whether or not it does. But certainly Plaintiff, as my friend and trusted advisor, who had agreed in writing to lend his legal expertise to drafting documents and advising on the structure and wording of agreements related to Manzanita, had in my view a duty to protect me from the risk of his canceling agreements saying he was entitled to because I was unlicensed, and had a duty to tell me about that risk, and get my knowing consent to that risk, before such agreements could be considered fair and reasonable (as required by rule 3-300 as I understand it) and before they could be enforced against me, as Plaintiff now seeks to do. It would be the ultimate in unfairness to try to take the last in the series of transaction and events, with documents prepared by Plaintiff and not reviewed by any lawyer for me other than Plaintiff, to view them out of their context and sequence in the wrongful way that Plaintiff swindled me. Not only did he not pay the full $ 125,000 he promised to pay me on Manzanita, but he drew up Manzanita so his "promise" to pay that $125,000 is not secured, and is not even evident in any document except the promissory note that he drew up and obtained my signature on—it is not even signed by him. He structured the transaction so that he would have security- a deed of trust on my property—but with no security to enforce his promise to pay me. Then he told me he had an emergency, when I received some money from another source in March of 2007, and asked if I could help him, and I said of course, but I need the money back within 2-3 weeks. I gave him a check marked "loan," which he has never repaid, and then he ordered me once the check had cleared to leave the Prospect job, preventing me from completing it. How this becomes in his mind a wrong that he feels I did to him is hard for me to imagine, thus I call it the Morrison swindle.

28   Mark told me in early 2006 that he felt it would be good since we were planning to build houses together at Manzanita and were planning to consider other ventures in the future involving building and development, to see how well we might function in working together on actual building projects prior to the start of construction on Manzanita. We went over together books of design that I own involving the ideas of C Alexander and also Timber house construction, and Mark wanted me to utilize some of those ideas to help him in his plan for Prospect as well.

13

DECLARATION OF ULI ZANGPO OPPOSING
MOTION FOR RECONSIDERATION OF REFERRAL TO ARBITRATION

29  Mark told me that he wanted the building he was building to be beautiful, much like the houses we were going to build at Manzanita, but without the very high quality standards that he'd choose to apply to his personal home. We talked about using resources from the land at Manzanita to help with Prospect, and we did in fact use the rock from Manzanita.

30  Part of my upbringing was in an Amish community. In that respect, I was taught to help my friends, neighbors and partners. Plaintiff told me he was having trouble with his contractor. Although he likes to present his troubles as coming from me, a copy of his letter to the City of San Anselmo after he got red tagged for doing work for which he did not have proper building permits on his owner/builder building permit is attached hereto as Exhibit B, which is frankly much more honest that his complaint against me herein. My intent and approach was to try to help him because he asked and he was my partner and legal advisor.

31  Plaintiff states that I needed money when I started to help him with Prospect. This is only partially true. The money I needed was the money he had already promised me and owed me on Manzanita. I needed the rest of the Mark's financial commitment on Manzanita funded to get Manzanita rolling. The Manzanita partners wanted it to get going. I felt I needed to help Mark so Mark could finish funding Manzanita and Manzanita could move forward. I sold some land in the Spring of 2007, and had some substantial money available to me from that sale. My plan was to use that to help fund Manzanita, while waiting for Mark to complete his promised funding. While this need was important, it was not week to week urgent. So when Mark asked to borrow $ 100,000 from me for 2-3 weeks, I loaned it him. (Exhibit A, attached hereto.) However, when he both did not pay it back, and did not fund his $ 125,000, that produced a financial shipwreck for my participation in Manzanita.

32  Mark came to me, "Uli I cannot make my commitment on time since Prospect is not going well." At this time Paul Warren was contractor, not me. (note that Mark always talks about the final Prospect deal, he is ignoring the interim Prospect deals. I remember that there was a preliminary Prospect deal that had a mediation clause and which was witnessed.

14
DECLARATION OF ULI ZANGPO OPPOSING
MOTION FOR RECONSIDERATION OF REFERRAL TO ARBITRATION

33    At Marks request I looked at Prospect to help Mark get out of it. Mark was freaked out; he told me he was afraid of bankruptcy, and was afraid of Paul; and also that he could not finish his commitment to Manzanita without Prospect being complete.

34    At least one Manzanita partner was at times opposed to my helping Mark on Prospect, but when it was announced that a person we all knew and trusted, Jake, would become the general contractor, then Steven felt that was a good plan so he at one point approved it. Later, conditions changed and he was no longer in favor of it. . The Manzanita partners all expected to live together on Manzanita, and it was natural to help each other out with each person's respective skills.  I relied on Plaintiff to advise me if there was any special risk for me in doing these agreements with him. Plaintiff did not advise against them or warn me of the risks, even though he was my fiduciary., my partner, and the legal advisor to our partnership together.

I have personal knowledge of the facts set forth herein, and if called upon to do so, I could competently testify to the same.  I declare under penalty of perjury that the foregoing is true and correct. Executed at Forest Knolls, California this 14th day of August, 2008.

/s/  Uli Zangpo

_____

Uli Zangpo

```
ULI K ZANGPO                                    90-7758         0051
PO BOX 567                                       3211
FOREST KNOLLS, CA 94933              Date 12 Mar '07

Pay to the
Order of  Mak Morrison                              | 100,000.00

one hundred thousand & No/100                           Dollars

▲ Redwood      (800) 479-7928
  Credit Union 209 THIRD STREET
               SAN RAFAEL, CA 94901

For Bridge loan                      U. K Zangpo

⑆321177586⑆ ⑈1000000272612⑈ 0051

⑆321177586⑆                          ⑈0010000000⑈
```

```
122000496
NCSC  03/13/07                >122000496<
2424637492                    UNION BANK OF NA
                              MTRY PK 91755
                              031307 415483 0304
```

Exhibit A to Uli Zangpo Declaration

Mark Morrison
524 San Anselmo AVE, No. 224
San Anselmo, CA 94960
T 415-686-2763
F 415-366-1415
mark@markmorrisonlaw.com

Barbara Chambers
Assistant Planner

Re: Planning Application – 30 Prospect Avenue, San Anselmo

Dear Barbara,

    The purpose of this letter is to share my story with respect to this house. I am married with two young children and our third due in October. When we bought this house we intended on making it our home. I am a consumer advocate trial attorney and fighting corporations for 16 years finally took its toll on my health so we decided to take a sabbatical for a year or so which required simplifying our lives including a smaller house out of state. I came up with the clever idea of remodeling this house to make a few extra dollars as I was not going to be generating any income --- I naively told my concerned wife the house would be completed and sold by September. This first error in judgment was to be quickly followed by two more --- hiring a young friend who had just received a contractor's license and another friend who was an out of work engineer to be the architect. With permit in hand the demolition began and we discovered a host of construction defects: only 5/8" of the South wall was on the foundation; the prior garage addition was attached to the existing structure by twelve nails and the floor had dropped 1 ¼" and the East great room prior roof addition had been cobbled together so poorly it was easier to demolish and rebuild than repair. I could have covered up these defects and built an inadequate house but chose to follow my sense of what was more true to my purpose.

    I had formed a relationship with the neighbor across the street who also is part of a design group and they quickly redesigned the house and they helped me to realize my contractor was not capable of finishing the house and that engineers are really not architects. I asked the contractor to leave and hired Rushton Chartock to finish the plans for the revision. I am now in the process of remedying my past errors. What I want to communicate is that my intentions are pure with this project in that goal is to serve the community by constructing a beautifully elegant home for a San Anselmo family and meet our financial needs. We have decided to delay our sabbatical and our moving back to Marin in a small apartment until this house is completed and sold. At this point it will require grace for us to finish this house in a timely manner and without a loss. I appreciate your support.

Very Truly Yours,

Mark Morrison

Exhibit B to Uli Zangpo Declaration